Irene **RAZA**, Appellant,

v.

Walter F. **SULLIVAN**.

No. 23420.

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1970.

Decided June 12, 1970.

Petition for Rehearing Denied July 24, 1970.
Certiorari Denied Jan. 11, 1971.
See 91 S.Ct. 458.

Mr. Charles A. Dukes, Jr., Hyattsville, Md., for appellant.

Mr. Walter J. Murphy, Jr., Washington, D. C., for appellee.

Before WILBUR K. MILLER, Senior Circuit Judge, WRIGHT and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

Appellant brought this negligence suit in the District Court to recover damages for a jaw bone fracture suffered during the extraction of a wisdom tooth. The matter went to trial before a jury, but at the close of appellant's case the judge directed a verdict for appellee, the dentist who had extracted the tooth. For the reasons hereinafter ap-

---

pearing, we reverse the judgment of the District Court and remand the case for a new trial.

## I

Appellant's case consisted principally of her own testimony, and that of the oral surgeon to whom she was referred by appellee after the jaw fracture was discovered. Appellant testified that she kept a dental appointment with appellee for the purpose of having the wisdom tooth pulled. At the end of an unusually prolonged and apparently difficult extraction, in the course of which appellee assertedly exhibited signs of growing impatience and frustration, appellant sensed a snapping sound in her jaw.[1] By the next day she felt considerable pain and immobility in the affected area, and returned to appellee who concluded that there might have been a fracture. He sent her to the oral surgeon, who confirmed this diagnosis.

The oral surgeon, Dr. Mead, a conceded expert, then testified for appellant as to the accepted methods of wisdom tooth extraction. He said that dentists will, as appellee did herein, first x-ray a patient's jaw in order to make a prior determination of the force level which should not be exceeded. Then, dentists generally break the tooth and remove its pieces, or, as was done here, cut around the tooth and raise it with an "elevator." During these procedures, dentists will use their experience and "sense of feel" as a check against exceeding the permissible force level. Acting by reference to this prior determination is an important part of the accepted procedure. Dr. Mead testified that "[i]f you are following accepted procedures you don't use excessive force." Dr. Mead opined that an intentional use of excessive force would be negligent, but would not state an opinion as to whether an accidental use of excessive force would be. He also testified that wisdom tooth extractions do not, if the accepted procedures are being observed, normally result in jaw bone fractures.[2]

At the close of appellant's evidence, appellee moved for a directed verdict and indicated his purpose to stand upon that motion if it were denied. In support of the motion, it was mainly argued that appellant had adduced no evidence of any standard relating to the extraction of a wisdom tooth, nor of any departure from such a standard if one be assumed to have been shown. This contention appeared thereafter to develop into a claim that appellee had at most been shown to have made a mistake in judgment, in the exercise of which, so it was said, medical men are legally immune from liability.

---

1. Appellant's testimony was that, as the extraction effort proceeded, appellee remarked that it was giving him the most difficulty he had had "in forty years." She also said that, as time wore on into the second hour, appellee was "getting impatient," "more and more upset," "excited, heated," "red in the face," and "breathing heavily." When the tooth finally came out, she "felt as though my ear had been wrenched out;" and appellee characterized the tooth as "really a monster." Appellant then "heard a crack, and I looked up and I realized [appellee] was bending over me, and I said 'Doctor, what was that?' and he said, 'I don't know.'"

2. The question by appellant's counsel which Dr. Mead was permitted to answer on this score was:

"Q. Then if the correct procedure is followed, Doctor, including, as I understand you to say, what amounts to a sort of predetermination about how much force may be applied and should be applied, can one expect in light of ordinary experience for a fracture to occur?
"A. Ordinarily, no."
Earlier in Dr. Mead's direct examination, this colloquy occurred:
"Q. Doctor, have you an opinion as to whether or not a broken jaw and or nerve damage is of such a character as in the light of ordinary experience is likely to occur as a result of negligence in extraction?
"Mr. Murphy: If Your Honor please, I object.
"The Court: I'm afraid I will have to sustain the objection."

Appellant in response appeared to assume that reliance upon *res ipsa loquitur* was foreclosed by the decision of this court in Brown v. Keaveny, 117 U.S.App.D.C. 117, 326 F.2d 660 (1963). Her contention was that the testimony given by her as to appellee's agitation and impatience over the lengthy resistance of the tooth to his efforts was evidence from which the jury could infer that appellee had improperly exceeded the pre-determined force level referred to in Dr. Mead's testimony as an essential element in the accepted procedure for wisdom tooth extraction.

The trial court, in granting the motion, characterized our *Brown* decision as holding in malpractice cases that "the issue may not be resolved by the jury without the aid of expert opinion." It was this case, however, which caused it to say that it would deny the motion but for the seeming unavailability in this jurisdiction of the doctrine of *res ipsa loquitur* in medical malpractice cases:

"I have given consideration to this motion * * * and if I were free to do so I would rule that a res ipsa loquitur applies in the sense that it raises an inference of negligence and calls on the defendant for an explanation of why this unusual occurrence took place of breaking the plaintiff's jaw when she was there to have a tooth extracted, but I do not feel free, in the light of the decisions of the Court of Appeals, to make such a ruling."

II

On this appeal, in addition to arguing that there was sufficient evidence of specific negligence to counter a directed verdict, appellant reverts to the concept of *res ipsa loquitur*. This last takes the form of a complaint that the trial court erred in sustaining the defense objection to the question first asked of Dr. Mead as to whether a broken jaw "in the light of ordinary experience is likely to occur as a result of negligence in extraction." Note 2, *supra*. Whether this was error or not seems to us essentially unimportant since Dr. Mead was later permitted to answer the inquiry as to whether, given the observance of accepted procedures, it may be expected "in light of ordinary experience for a fracture to occur." His answer was: "Ordinarily, no." Note 2, *supra*.

■ This second question was, in our view, a proper formulation of a *res ipsa loquitur* inquiry in a malpractice case of the kind before us.[3] Appellant cannot, therefore, be said to have been foreclosed from eliciting the answer she sought. We do not, thus, consider that reversal is necessitated solely because Dr. Mead was not permitted to answer the earlier question.

■ Where the trial court did err was in professing to believe that, in this jurisdiction, *res ipsa loquitur* can play no role whatsoever in medical malpractice cases. The court explicitly stated that the position it took was dictated by our decision in *Brown* and it characterized that case as stating "very clearly that in a malpractice action where the question turns on the merits and performance of scientific treatment, the issue may not be resolved by the jury without aid of expert opinion."

*Brown* was, however, a case in which no expert opinion was adduced by the

3. There is, obviously, no rule that every medical malpractice case must have expert testimony as a basis for the invocation of *res ipsa*. The absent-minded nurse or surgeon who leaves a sponge or surgical tool in the patient's body is vulnerable to purely lay opinion that this is below the prevailing standard of care. *See* Christie v. Callahan, 75 U.S.App.D.C. 133, 136, 124 F.2d 825, 828 (1941). But a case like the one before us, involving the exercise of professional skill and judgment, is a far cry from the barrel falling from the upper floor of the warehouse on the head of the innocent passer-by in the street, which was what was involved in the case commonly thought to be the first articulation of the *res ipsa* doctrine. Byrne v. Boadle, 1863, 2 H. & C. 722, 159 Eng.Rep. 299.

plaintiff.[4] What the majority in that case held was that, at least in some classes of malpractice cases, it is not enough for a layman to prove merely the fact of injury and then to invoke *res ipsa loquitur* upon an assumption that it is common knowledge that the injury would not have occurred absent negligence. This is so because in the medical field doctors cannot guarantee satisfactory results in all cases even where they are observing accepted medical procedures.

In our later case of Smith v. Reitman, 128 U.S.App.D.C. 352, 389 F.2d 303 (1967), Judge (now Chief Justice) Burger, speaking for the court, was at some pains to dispel the notion "that the doctrine [of *res ipsa loquitur*] can never be available in malpractice cases." That was a case also involving a jaw injury incident to a dental operation. Although the plaintiff there did offer an expert witness who voiced the opinion that, because injury resulted, a mistake must have been made, the expert witness rested largely upon that bare assertion and gave no explication of accepted procedures or how negligence could on occasion intrude into those procedures. The court concluded that a record in that condition "does not create the basis for invoking *res ipsa loquitur*."

The expert testimony brought out by appellant in the case before us is of quite a different order. Dr. Mead testified at length and in detail as to the accepted procedures for effecting the extraction of a wisdom tooth with due care for the avoidance of the kind of injury which occurred here. Those procedures were said to include a pre-operation survey for the purpose of fixing the level of force which under no circumstances should be exceeded in the physical extraction itself. It was his professional opinion that, if these accepted procedures were followed, a jaw fracture would not "ordinarily" happen.[5]

We ourselves have said, in common with other authorities, that "ordinarily" is the key word in the concept of *res ipsa loquitur*. In Quick v. Thurston, 110 U.S.App.D.C. 169, 172, 290 F.2d 360, 363 (1961), we denominated that concept to be "a common sense rule which allows an inference of negligence where the occurrence complained of *ordinarily* [emphasis supplied] would *not* happen in the absence of negligence." *See* Prosser, Torts § 42, and Judge Wright's dissenting opinion in *Brown*. Dr. Mead's testimony expressly embraced the possibility, therefore, that appellant's injury could have been the consequence of negligence in the sense that appellee, in the execution of the applicable accepted procedures, may have deviated from them. That this deviation be thought to have been intentional is not, in our view, essential to culpability. The surgeon who, without intending to do so, lets the knife slip and cuts too deeply may still be liable for malpractice.

---

4. Even in *Brown* there was no direction of a verdict at the end of the plaintiff's case. The allegedly errant dentist testified in his own defense, but, as Judge Wright pointed out in his dissent, he supplied little, if any, information about accepted procedures or the degree to which he observed them. His testimony was heavily preoccupied with his wonderment that the injury should have occurred at all, thereby emphasizing the extraordinary nature of the event.

5. The dissenting opinion in *Brown*, where no expert witness testified for the plaintiff, was premised in considerable degree upon "what has been referred to as the conspiracy of silence—the refusal on the part of members of the profession to testify against one of their own [footnote omitted] for fear that one day they, too, may be defendants in a malpractice case." *See* Note, Overcoming the "Conspiracy of Silence": Statutory and Common-Law Innovations, 45 Minn.L.Rev. 1019 (1961); Note, Medical Malpractice—The Medical and Legal Aspects of the Post-Prostatectomy Urinary Incontinence Suit; 17 Buffalo L.Rev. 471, 487–490 (1969). Whatever may be the validity of that premise generally, it was not visible in the record before us. Dr. Mead, to whom appellee referred appellant for treatment, testified at length for appellant.

Appellant's testimony is suggestive, albeit far from conclusive, that there may have been a deviation of the kind contemplated by Dr. Mead. We do not, of course, mean to suggest that this record points inescapably towards liability. What we do say is that appellant had shown enough to defeat a motion for a directed verdict at the close of that showing. It was the trial court's instinctive preference that appellee should be called on "for an explanation of why this unusual occurrence took place."[6] We agree, and our difference with that court is only over its feeling that it had no room to indulge that preference. We reverse and remand so that it may do so.[7]

It is so ordered.

WILBUR K. MILLER, Senior Circuit Judge, dissents.

6. The dissenting judge in Smith v. Reitman, *supra*, where no defense testimony was received, concluded alternatively that "[A]t least the defendant should have been put to proof."

7. We, of course, do not speculate as to what the situation may be at the close of all the evidence. Defense testimony that due care was used will not in itself eliminate the inference rooted in the probabilities of human experience. Classic *res ipsa* theory contemplates that a defense showing can be such, however, as to eliminate that doctrine from the case, leaving the trial court under the necessity of dealing with the state of the evidence unaided by any inference deriving from it alone. *See* Restatement (Second), Torts, § 328D, comments n, o (1965).