Steven Clair DICK, an incompetent, by Gordon Clair Dick, his guardian ad litem, Plaintiff,

v.

Dr. Asle Kingsley LEWIS, Lisbon Memorial Hospital, and Jane Doe and Rachel Roe, whose true names are to plaintiff unknown, Defendants.

Civ. No. A78–3018.

United States District Court, D. North Dakota, Southeastern Division.

Jan. 28, 1980.

Wayne G. Aarestad, Aarestad & Aarestad, Fargo, N. D., for plaintiff; Robert W. Rischmiller, Rischmiller, Wasche & Knippel, Minneapolis, Minn., of counsel.

H. Patrick Weir, Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, N. D., for Lisbon Memorial Hospital.

Frank J. Magill and E. T. Conmy, III, Nilles, Hansen, Selbo, Magill & Davies, Ltd., Fargo, N. D., for Dr. Asle Kingsley Lewis.

## MEMORANDUM OF DECISION AND ORDER

BENSON, Chief Judge.

Plaintiff in this action suffers from cerebral palsy, spastic paraplegia and mental retardation. He alleges his condition resulted from the negligent mishandling of his birth in 1960. The thrust of his case is that defendants, through inadequate procedures, permitted a prolonged labor due to cephalopelvic disproportion which resulted in a perinatal asphyxia that caused the cerebral palsy. Defendants denied the allegations and the case was tried to the court without a jury. At the close of plaintiff's evidence, the court granted a Rule 41(b) motion and ordered a dismissal as against all defendants except Dr. Asle Kingsley Lewis. This memorandum and findings relate to the alleged liability of Dr. Lewis.

## FINDINGS OF FACT.

In April 1959, plaintiff's mother, Mrs. Mona Lavelle Dick, at nineteen years of age, became pregnant with her first child. Dr. Walter Craychee, Oakes, North Dakota, provided her prenatal obstetrical care until about midway through the third trimester. At that point Dr. Craychee became ill and referred Mrs. Dick to Dr. Lewis, a general practitioner at Lisbon, North Dakota, a rural community.

On January 18, 1960, Mrs. Dick began experiencing irregular pains which she believed to be labor contractions. Dr. Lewis hospitalized her in Lisbon Memorial Hospital. On the morning of January 19 she was having light regular pains which later again became irregular. An examination by Dr. Lewis disclosed a slow minimal dilation of the cervix. In an attempt to change the pattern of contractions and stimulate the labor to take off on its own, Dr. Lewis twice administered a small dose of Pitocin subcutaneously. Pitocin is a drug which

was customarily used by physicians at the time of plaintiff's birth to induce labor contractions. The initial reaction to the Pitocin was a hardening of the contractions and a firming up of the regularity but no change in the dilatation.

January 20 was an uneventful day. Mrs. Dick was given supportive care and rest. Pains continued on an irregular basis. Mrs. Dick was restless and alternately crying and dozing. At 11:30 PM she was only 3–4 cm dilated. In the early hours of January 21 her dilatation progressed and her contractions became very hard. At 2:00 PM she was taken into the delivery room and at 4:30 PM, after about sixteen hours of actual labor and following an episiotomy and spontaneous cephalic delivery, she gave birth to plaintiff, a nine pound boy.

Prior to actual delivery, the child was in a left occiput posterior (LOP) position and spontaneously rotated to left occiput anterior (LOA) position. The membrane ruptured spontaneously, immediately prior to birth. At all times following the hospitalization of the mother and prior to the birth, the mother and fetus were monitored pursuant to the procedures customarily followed by competent practitioners in the Lisbon and similar rural communities at that time. There was no indication of fetal distress at any time. At birth, the baby's color, cry and respiration were all good. While in the hospital the baby ate well and stooled and urinated normally. There was no perinatal or neonatal asphyxia or anoxia. The size of the child's head was normal. The record further indicated no anomalies or injuries were apparent.

Pursuant to the standard and customary procedure in effect at Lisbon Hospital at that time in the handling of all new born babies, plaintiff was cleaned, aspirated and wrapped and kept warm by placing him in an open top incubator which served as a bassinet. A low flow of oxygen was passed into the incubator through a tube for a period of thirty minutes in such a way as to allow the baby to breathe a mixture of room air and oxygen. The baby was then moved to the nursery.

Mrs. Dick's third child weighed nine and one-half pounds at birth. An x-ray pelvimetry done on Mrs. Dick at St. Mary's Hospital, Minneapolis, Minnesota, prior to the birth of her third child at a time when she was three weeks overdue, indicated that Mrs. Dick's pelvis was "essentially gynecoid" (normal). The pelvimetry disclosed her pelvic measurements to be slightly larger than average. The anteroposterior measurement was 7.6 cm and the transverse measurement was 11.9 cm. Bony pelvic measurements in a mature female do not change. Cephalopelvic disproportion did not exist at the time of plaintiff's birth. A caesarean section was not indicated at any time following Mrs. Dick's hospitalization and prior to the birth of plaintiff.

Plaintiff suffers from cerebral palsy, spastic paraplegia and mental retardation. He has two younger brothers and two younger sisters, all of whom are normal active children. Plaintiff's parents did not become aware of his abnormality until approximately eight months after his birth.

Because the need of a fetal brain for oxygen is much less than the need for oxygen in the brain of an older child, perinatal asphyxia does not usually cause cerebral palsy. Genetic factors are a recognized cause of cerebral palsy. There are many instances of genetic predilection in the Dick family tree. The cause of the cerebral palsy in plaintiff cannot be identified but genetic influences as a cause is considered to be the foremost probability.

### CONCLUSIONS.

The court on the basis of all the evidence in the case concludes that plaintiff has failed to prove that any act which the defendant did or may have failed to do in the care and treatment of plaintiff's mother and plaintiff prior to or following plaintiff's birth was a cause or contributing cause of plaintiff's cerebral palsy, spastic paraplegia or mental retardation.

### RATIONALE.

Plaintiff built his case against the defendants on a theory that plaintiff's cere-

bral palsy and other afflictions resulted from defendants' negligence in the procedures employed in attending plaintiff's mother following her hospitalization and during the ensuing seventy-two hour period to the completion of the birth process. His theory is based on an allegation that Dr. Lewis permitted plaintiff's mother to remain in active labor for the entire period between her initial hospitalization and the birth; that a condition of cephalopelvic disproportion [1] existed which indicated a need for caesarean section; that the failure to perform or arrange for the performance of a caesarean section caused fetal distress resulting in asphyxia and anoxia, the result of which was cerebral palsy. Plaintiff supports his theory by Dr. Lewis's final clinical diagnosis of "cervical dystocia" made by him following the birth; by the fact that during the entire period of Mrs. Dick's hospitalization she did experience contractions and pains; by the testimony of Mrs. Dick and her husband relating to the appearance of the baby at birth and by the opinion of his expert witnesses, Doctors Thomas Krezowski and Joseph Sockalosky both of whom testified by deposition prior to trial. Further, plaintiff contends the records in the case were both insufficient and supportive of plaintiff's claims.

The plaintiff's experts, Doctors Joseph Sockalosky and Thomas Krezowski, both testified that cephalopelvic disproportion existed in the case of Mrs. Dick. They based their opinion solely on the hospital's and Dr. Lewis's records. During one of the prenatal visits Dr. Lewis had clinically examined Mrs. Dick and had recorded on her records that she had a transverse measurement of her pelvic outlet of 8 cm. He noted that this indicated a small outlet. Recognized medical treatises stated that the average transverse outlet measurement was 10 cm. The importance of this measurement is that the pelvic outlet is the smallest non flexible structure which the fetus must pass through in delivery. Steven weighed nine pounds at birth, which plaintiff's experts

described as a large baby. In comparing the 8 cm measurement, which they considered to be a contracted outlet, with the large size of the baby, plaintiff's experts arrived at their conclusions that there was cephalopelvic disproportion.

Plaintiff's experts did not consider the fact that Mrs. Dick had an x-ray pelvimetry done prior to the birth of her third child in 1963. This information was apparently not made available to them for it is not mentioned in their testimony. By use of x-ray pelvimetry, which was not available in the Lisbon Memorial Hospital in 1960, an accurate measurement of the actual pelvic bony structure can be made. Dr. Lewis's clinical estimate was not as accurate because as he explained fleshy tissue can make the clinical measurement appear smaller than the actual bony measurements are.

An x-ray pelvimetry done at St. Mary's Hospital in Minneapolis in 1963 indicated the following pelvic outlet measurements: the anteroposterior measurement was 7.6 cm and the transverse measurement was 11.9 cm rather than the 8 cm clinical estimate by Dr. Lewis, for a total actual outlet measurement of 19.5 cm. Dr. Lewis testified that the average normal total actual outlet measurement is 18 cm. This was not disputed.

The pelvic measurements that existed in 1963 also existed in 1960 because bony pelvic measurements do not change. Therefore, contrary to Dr. Lewis's clinical determination and plaintiff's experts' assumption based on that determination recorded in the medical records, the size of Mona Dick's pelvic outlet was larger than average.

Pelvic measurement alone is not determinative on the issue of cephalopelvic disproportion. The size of the head of the fetus must also be considered. Dr. Lewis testified that in 1960 the size of the fetal head was difficult to ascertain prenatally. There was no accurate measurement made of plaintiff's head, nor was there recorded a

1. Cephalopelvic disproportion is a disproportion of the size of the head of the fetus to the mother's pelvis, which may result in an abnor-

mal delivery. An abnormal delivery is termed dystocia or uterine disfunction, a failure to progress in labor.

measurement of the fetal head size of Mrs. Dick's third child involved in the x-ray pelvimetry. But the weights of the two infants are known. Steven weighed nine pounds at birth and the third child weighed nine pounds nine and one-half ounces. When the x-ray pelvimetry was done in the case of the third child, the doctor at St. Mary's concluded that there was no definite cephalopelvic disproportion noted. Dr. Lewis testified that there is a general relationship between weight and head size. There is no evidence in the case indicating plaintiff's head at birth was larger than normal. Dr. Cullen, one of defendant's experts, examined Steven shortly before trial and testified that there was at that time no disproportion present in Steven's physical extremities. The court's opportunity to view the plaintiff in court supports that conclusion.

The fact that cephalopelvic disproportion did not exist supports Dr. Lewis's judgment that a caesarean section was not indicated. Plaintiff's expert, Dr. Krezowski, testified a caesarean section *possibly* would have lessened or avoided the alleged injury to plaintiff, but on cross examination he admitted he had limited his testimony on causation to a cephalopelvic cause of cerebral palsy.

Dr. Sockalosky, on the other hand, did not limit his opinion on causation to cephalopelvic disproportion. He stated that during the course of Mrs. Dick's labor, dystocia existed, caused by either cephalopelvic disproportion, ineffective uterine contractions, or other causes. Dr. Lewis testified that his diagnosis of cervical dystocia was a retrospective diagnosis, and that the diagnosis indicated a normal variation of pregnancy. He testified Mrs. Dick had a firm cervix, but that the appropriate treatment was not a caesarean section but rather supportive care and rest so that the normal process of effacement and dilatation could take place.

The total time that Mrs. Dick was in actual labor is in dispute. Defendant's experts, including Dr. Lewis, testified that their examination of the records caused them to conclude that Mrs. Dick did not go into actual labor until midnight, January 20, the beginning of the day Steven was born, and the contractions she experienced up to that time were false labor, which in medical parlance is referred to as Braxton-Hicks contractions. Dr. Lewis testified the Pitocin was administered during false labor to change the pattern to a more active type. According to the testimony of Doctors Lewis and Craychee, who are familiar with the standard of care in a community like Lisbon in 1960, such a subcutaneous administration in false labor was proper[2] and standard treatment at that time. It was the opinion of Dr. Lewis and his experts that Mrs. Dick had a sixteen hour actual labor which was not abnormal. The average labor is fourteen hours.

The opinion of plaintiff's experts that Mrs. Dick was in actual labor for seventy-two hours is not supported by other medical evidence in the case which indicated an irregularity of contractions, intervals when Mrs. Dick was sleeping without being heavily sedated, the position of the fetus, and the fact that cephalopelvic disproportion did not exist.

There is evidence in the case indicating that the contractive forces of the pelvis on the fetal head and placenta of a prolonged active labor over a seventy-two hour period would greatly increase the risk of insufficient oxygen supply to the fetus. A decreased supply of oxygen to the fetus over a long period of time could result in asphyxia or perinatal cerebral anoxia, permanently destroying brain cells which is the most likely cause of cerebral palsy. On the other hand, Dr. Ron Harold Miller, a pediatric specialist called by defendants, testified that perinatal asphyxia does not necessarily lead to brain damage. Dr. Miller relied on a 1979 medical journal article written by Dr. Kenneth Niswander from the University of California-Davis, which indicated that the scientific basis for relating perinatal

2. Plaintiff's experts who had testified that administration of Pitocin during false labor was improper, had misinterpreted Dr. Lewis's medical records to indicate he had given an intramuscular injection.

asphyxia to subsequent brain damage in an individual patient is tenuous at best. He also cited a 1979 article written by Dr. Ronald Illingworth in the British Medical Journal suggesting that cerebral palsy is unlikely to be due only to an episode of perinatal anoxia. Plaintiff relies on a 1975 edition of *Nelson on Pediatrics* which states that cerebral anoxia is the most likely cause of cerebral palsy.

Dr. Joseph Cullen, a pediatric neurologist at the Crippled Children's School in Jamestown, North Dakota, testified that cerebral palsy, a nonprogressive motor disfunction, is caused by an event. But this event could occur in the prenatal period, the perinatal period, or the postnatal period. Recognized prenatal events include hereditary genetic factors, or in utero infections. There is evidence that Mrs. Dick may have suffered such an infection. Perinatal events include anoxia or hemorrhaging. Postnatal events could include infections or vascular injuries. There is evidence that on February 10, 1960, when plaintiff was three weeks old, he was brought in to Dr. Lewis for treatment of an infection that had resulted in "loose stools for 5 days." Dr. Lewis recommended hospitalization which was refused by plaintiff's parents.

There is evidence in the record of extensive genetic defects spread over several generations and several branches of the Dick family tree. Doctor Miller and Dr. Cullen were both of the opinion that this incidence was so high that it was more probable than not the cerebral palsy was the result of genetic factors rather than circumstances surrounding birth. Plaintiff's experts did not have that information available to them when they made their opinion as to causation, because both of plaintiff's parents had previously denied that there were any such defects in the Dick family tree.

Dr. Cullen did a CAT scan on Steven to determine whether a congenital anomaly or a defect linked to genetic origins existed. The CAT scan proved normal. Plaintiff, in his summary of the evidence, relies on the CAT scan and rules out a genetic cause of the cerebral palsy. However, a normal CAT scan does not dictate that result. Dr. Cullen testified the CAT scan shows only structural defects. It cannot disclose anything about a genetic origin of the cerebral palsy other than a structural defect, and a genetic cause would not necessarily manifest itself as a structural defect.

■ Assuming perinatal asphyxia to be a cause of cerebral palsy, plaintiff has failed to prove that such a condition existed in his case. Dr. Sockalosky's conclusion that plaintiff suffered brain damage was based on the "requirement for supplemental [oxygen] for the first half hour after birth, the irritability of the baby during the first full day of life and the occurrence of episodes of duskiness." This evidence was supplemented by the testimony of plaintiff's parents that the baby was floppy, that it had a long pointed head, that it was initially a deep blue color and later a yellowish color, that the baby didn't feed well and that the baby wouldn't cuddle or cling. Plaintiff's mother further testified that right after the baby was born one of the nurses attending her in the delivery room told her the baby was dying. Additionally, plaintiff attaches significance to the nursery record indicating the baby was placed in the nursery at 10:00 PM, the inference being that the baby was receiving special care between the 4:30 PM delivery and 10:00 PM.

Dr. Lewis testified it was the standard and customary procedure in 1960 to give all new born babies a low flow of oxygen mixed with room air for thirty minutes after birth. The episodes of duskiness were set out in the record as "turned dusky twice about 6:50 PM." This obviously is a record of a transient and not a prolonged episode. Dr. Miller, a pediatrician, testified that newborns turned dusky very readily because they do not have the fine tuned control of capillary muscles that an older child would have. Dr. Lewis had circumcised the baby a little earlier and attributed the dusky episode as being a reaction to the circumcision. Dr. Miller confirmed that such a reaction is very common after a circumcision. The record does not show the

baby was irritable during the first full day of life. The record shows the baby "cried most of the night on the 22nd."

The nurse who at the time of plaintiff's birth was the supervisor of nurses and the anesthetist at the Lisbon Hospital testified that she attended the birth; that one other nurse was present and that the statement attributed to a nurse that the baby was dying was not made and that it would not be made by a nurse. She further testified the mother remained in the delivery room one-half hour after birth during which time she was under sedation while the episiotomy was repaired. She was then taken to her room and the baby was taken to the nursery. She stated that a time notation next to an entry in the record was the time the entry was made and not the time an event occurred, and that chart entries were made by a nurse from her work book at the time she went off duty. She further stated that in 1960 emphasis was on patient care and not record keeping; that the chart was used primarily to record serious or significant findings and no record would be an indication that things were normal.

The record is clear that a baby suffering from perinatal asphyxia and anoxia is a sick baby. A baby with good color, good cry, good respiration and a baby that breathed, stooled, urinated and ate normally is not a sick baby. The testimony of the parents differing sharply from the records in the case relative to the condition of the baby is not credible. Dr. Lewis, a practitioner in a rural community, demonstrated a high degree of medical knowledge, experience and integrity. The impression left with the court was that of a well trained low key competent family practitioner recognized by the community as being dedicated to professional competence and service to patients.

■ In an action for medical malpractice, the burden is upon the plaintiff to prove by a fair preponderance of the evidence those things essential to the recovery of a verdict. He must prove that the defendant was negligent and that plaintiff's damages were proximately caused by that negligence.

*Stoskoff v. Wicklund,* 49 N.D. 708, 193 N.W. 312, 315 (1923). Causation must be established before plaintiff may recover.

The term "proximate cause" embodies the requirement of "causation in fact," which asks whether the conduct of the defendant caused the plaintiff's harm. *Prosser, Law of Torts,* § 41 (1971). For if the defendants conduct did not in fact cause the injury complained of, there can be no finding of proximate cause.

■ Courts have generally applied one or both of two tests in determining whether factual causation exists. Under the "but for" or "sine qua non" rule, the defendant's conduct is not a cause of the event if the event would have occurred without it. *Id.* The North Dakota courts have incorporated the "but for" rule in their definition of proximate cause. In *Moum v. Maercklein,* 201 N.W.2d 399, 402 (N.D.1972), the court stated that "[p]roximate cause of an injury is a cause which in natural and continuous sequence, unbroken by any controlling, intervening cause, produces injury, and without which it would not have occurred." *See also Johnson v. Minneapolis, ST. P. & S.S.M. Ry. Co.,* 54 N.D. 351, 209 N.W. 786, 789 (1926). The other test for determining causation in fact is the "substantial factor" rule. Under it, the defendant's conduct is a cause of the event if it was a material element and a substantial factor in bringing it about. *Prosser, Law of Torts,* § 41 (1971). Although this test has not been used by North Dakota courts, it has been utilized by other courts. *See e. g., Oak Leaf Country Club, Inc. v. Wilson,* 257 N.W.2d 739, 746 (Iowa 1977); *Johnson v. Evanski,* 221 Minn. 323, 22 N.W.2d 213, 216 (1946); *Pendleton Woolen Mills v. Vending Assoc., Inc.,* 195 Neb. 46, 237 N.W.2d 99, 103 (1975); *Morgan v. Pennsylvania General Ins. Co.,* 87 Wis.2d 723, 275 N.W.2d 660, 666 (1979). As a practical matter, in the great majority of cases, the two tests would reach the same result. *Prosser, Law of Torts,* § 41 (1971).

■ Plaintiff has failed to prove Steven's cerebral palsy was caused or could have

been avoided by the manner in which Dr. Lewis conducted his delivery. It has not been shown by a fair preponderance of the evidence that Steven's cerebral palsy would not have occurred if a caesarean section had been performed. Nor has it been shown that failing to perform a caesarean section was a substantial factor in bringing about Steven's condition. In establishing proximate cause, the plaintiff must adduce evidence that shows plaintiff's theory of causation is reasonably probable, not merely possible, and more probable than any other theory based thereon. *Bryant v. Rankin*, 468 F.2d 510, 515 (8th Cir. 1972); *Oak Leaf Country Club, Inc. v. Wilson*, 257 N.W.2d 739, 746 (Iowa 1977). In light of the factual findings of the court, plaintiff has failed to meet this burden. Speculation and conjecture are not sufficient to establish causation. *See e. g., Scheid v. Cavanagh*, 65 N.D. 596, 260 N.W. 619, 620 (1935); *McDonnell v. Monteith*, 59 N.D. 750, 231 N.W. 854, 857 (1930).

The court holds that plaintiff has failed to prove either negligence or causation.

IT IS ORDERED that judgment be entered for the dismissal of plaintiff's complaint and cause of action.