William P. LEMKE and Bernadine B. Lemke, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. A3–81–112.

United States District Court, D. North Dakota, Southeastern Division.

Feb. 23, 1983.

Reed K. McKenzie and Mark Hallberg, Hvass, Weisman & King, Ctd., Minneapolis, Minn., for plaintiffs; Ward D. Briggs, Aarestad & Briggs, Ltd., Fargo, N.D., of counsel.

Lynn E. Crooks, Asst. U.S. Atty., Rodney S. Webb, U.S. Atty., Fargo, N.D., for defendant.

## MEMORANDUM OF DECISION AND ORDER FOR JUDGMENT

BENSON, Chief Judge.

This is an action under the Federal Tort Claims Act in which negligence in the providing of medical treatment by agents and employees of the Veterans Administration Medical Center in Fargo, North Dakota is alleged. Plaintiff William P. Lemke seeks monetary damages for permanent injury and disability to his left recurrent laryngeal nerve and left vocal cord. Plaintiff Berna-

dine B. Lemke, the wife of William Lemke, seeks monetary damages for the loss of her husband's consortium as a result of Mr. Lemke's injuries.

## FINDINGS OF FACT

The plaintiffs in this case, a husband and wife, are William P. Lemke and Bernadine B. Lemke. They reside at Route 3, Fergus Falls, Minnesota. The defendant is the United States of America, acting through its agents and employees at the Veterans Administration Hospital at Fargo, North Dakota.

On December 14, 1979 Mr. Lemke, a contract machinery hauler involved primarily in long distance driving, was admitted to Overlake Hospital in Bellevue, Washington, with a history of recurrent and increasingly severe chest discomfort. A coronary angiography performed while Mr. Lemke was a patient at Overlake Hospital revealed a 95% obstruction of the right coronary artery with minimal disease in the anterior descending and circumflex coronary arteries. Left ventricular function was normal. Mr. Lemke was discharged from Overlake on December 19, 1979 to return home to Fergus Falls, Minnesota. The physicians at Overlake had recommended that Mr. Lemke consider having coronary bypass surgery, primarily because his occupation took him away from immediate access to medical care.

Mr. Lemke flew home and, after consulting with his family physician, was referred to the Veterans Administration Hospital in Fargo, North Dakota. He was admitted to the VA Hospital on January 7, 1980. While hospitalized, a four vessel angiogram was performed on Mr. Lemke. The results of this test were interpreted by the doctors at the VA Hospital as indicating that Mr. Lemke was suffering from occlusive disease of the left and right carotid arteries. Carotid occlusive disease is a condition where plaque builds up on the walls of the carotid arteries, reducing the amount of blood flowing through them. The angiogram revealed 85% narrowing of the left carotid artery and approximately 70% narrowing on the right. The carotid arteries are the principal vessels supplying blood to the head and neck. It was believed by the doctors at the VA Hospital that this narrowing of the carotid arteries was causing Mr. Lemke's blurred vision, headaches, numbness and weakness.

Dr. George Iwen, a thoracic-cardiovascular surgeon on the VA Hospital's Surgery Service, examined Mr. Lemke and recommended that Mr. Lemke's condition be treated by bilateral endarterectomy. An endarterectomy is a surgical procedure where the plaque from the inside of the carotid arteries is removed, thereby increasing the arteries' blood flow capacity.

Prior to surgery, Dr. Iwen informed Mr. Lemke of risks associated with having surgery and risks associated with not having surgery. These risks were also discussed somewhat with Mrs. Lemke. Mr. Lemke was informed there was a chance he may suffer a stroke during surgery as a result of decreased blood supply to the brain or a clot travelling to the brain, and that such a stroke might cause paralysis in one half of his body. Mr. Lemke was also told if he were not to have the surgery, there was a 30% chance over the next five years that he would either suffer a stroke, continue to have the same symptoms, or die. Mr. Lemke was not informed of other risks associated with the procedure. Other risks include post-operative bleeding, hypoglossal nerve damage resulting in partial tongue paralysis, and recurrent laryngeal nerve damage causing hoarseness. Dr. Iwen was aware of these additional risks, although he had no experience with any of them in his prior surgeries. Dr. Iwen did not discuss these risks with Mr. Lemke because cranial nerve damage is not a usual risk, and doctors do not normally warn of all conceivable risks. Patients are not normally warned of the possibility of nerve damage resulting from an endarterectomy.

The technique employed in performing an endarterectomy is fairly standard. An incision is made between muscles in the neck. The carotid sheath is opened and the carotid artery is separated from the vagus nerve

and the jugular vein. The carotid artery is clamped to prevent blood flow or, in the alternative, a temporary carotid shunt is used. An incision is then made in the artery, the plaque is cleaned out, and finally the artery is closed. The clamps or shunt are removed and the incision in the neck is also closed.

Dr. Iwen performed an endarterectomy on Mr. Lemke's left carotid artery on January 22, 1980. He employed the above procedure, including the use of a shunt. He observed nothing peculiar about Mr. Lemke's anatomy in the operative area or about the location of the nerves adjacent to the operative site. Additionally, nothing unusual occurred during the operation. Following the January 22, 1980 surgery, Mr. Lemke noticed that his voice was hoarse and that his ability to speak at a normal volume was substantially reduced. His physicians initially believed that his voice would return to normal and that the hoarseness had been caused by the placement of the endotracheal tube through which the general anesthesia had been administered. However, his voice did not improve. Mr. Lemke's physicians then surmised that the voice problem was due to a nerve injury which should heal itself after approximately six weeks.

Mr. Lemke was discharged from the VA Hospital on February 2, 1980. His voice still had not improved. He was concerned about the endarterectomy that was to be performed on his right carotid artery and discussed this concern with Dr. Iwen. Mr. Lemke was concerned that a second operation might further damage his voice. Dr. Iwen told him that the second surgery was necessary. Additionally, Mr. Lemke was advised that the occurrence of nerve damage during the first operation resulting in voice loss was unusual, and therefore the likelihood of a recurrence was small. Dr. Iwen made these statements in an effort to allay Mr. Lemke's fears. Based upon these statements made by Dr. Iwen, Mr. Lemke consented to the endarterectomy on his right carotid artery.

The second endarterectomy was performed on April 9, 1980. Immediately after the operation, Mr. Lemke's voice was stronger. However, it returned to a whisper within a short time. He was discharged from the hospital on April 14, 1980, and not seen by Dr. Iwen after that.

Because his voice did not improve, he was evaluated by Dr. Arvid Johnsen, an otolaryngologist at the Oakdale Ear, Nose and Throat Clinic in Minneapolis on September 4, 1980. A physical examination revealed that he suffered left vocal cord paralysis characteristic of loss of innervation by the recurrent laryngeal nerve. The left vocal cord paralysis was confirmed by Dr. Markus Wolfensberger at the Minneapolis VA Hospital ear, nose and throat clinic. Mr. Lemke entered the VA Hospital in Minneapolis on January 26, 1981. On January 27, 1981, while he was under local anesthesia, teflon was injected into the left true vocal cord. During the procedure his voice was continuously monitored. After the procedure, which was frightening to him, it was necessary that his mouth remain open for two weeks. He has since had nightmares about the teflon injection procedure.

As a result of the teflon injection procedure, however, Mr. Lemke's voice quality has improved. After a followup visit to the ear, nose and throat clinic at the VA Hospital, he was again evaluated by Dr. Johnsen on November 15, 1982. Mr. Lemke's voice quality is described as "gurgly" and voice production is adversely affected by his attempts to speak loudly and by backward motion of the head. Although he has no discomfort in the laryngeal area and no difficulty swallowing, his voice quality is not expected to improve with time. Additional teflon injections might improve his voice, but the possibility exists that they would be of no benefit or would cause other laryngeal problems.

Mr. Lemke's poor voice quality has affected his social and family life. Prior to the teflon injection procedure he was reluctant to go out or to family get togethers. Additionally his poor voice quality caused him to get depressed and caused stress in

the relationship he had with his wife. Mrs. Lemke went to see a psychiatrist, thinking she was causing the problems between herself and her husband. The psychiatrist assured Mrs. Lemke that the problem was not with her and the stress in their relationship decreased only after the teflon injection treatment caused his voice to improve.

Additionally, Mr. Lemke's poor voice quality has affected his ability to work. Prior to the January 22, 1980 endarterectomy, he worked for International Machinery, hauling machinery long distances. The hauling of machinery involved the phoning of a dispatch center on a daily basis and the instructing of workmen while loading and unloading the machinery. His voice quality since his surgery has made it difficult, if not impossible, to perform these duties. Therefore, since December 1980 he has worked hauling grain. The hauls are of a shorter distance and he earns less money per mile hauling grain than he did hauling machinery. His doctors have encouraged him to haul locally so that he would be close to medical services if needed, but he would prefer to haul machinery rather than grain if he were able.

It is Dr. Iwen's assumption the injury to Mr. Lemke's left recurrent laryngeal nerve occurred during the January 22, 1980 endarterectomy. However, neither Mr. Lemke's medical records nor expert testimony at trial explain the specific cause of the nerve damage. Several possibilities exist: transection of the nerve during surgery; blunt trauma to the nerve during endotracheal tube placement or retraction and clamping of tissue; electrocautery; and lack of normal nerve regeneration.

The Lemkes commenced this action July 9, 1981. Prior to the filing of the complaint, the Lemkes had presented a claim to the Veterans Administration Medical and Regional Office Center, Fargo, North Dakota, as required by 28 U.S.C. § 2675(a). The claim was denied by letter on June 23, 1981. The case was tried to the court on November 23, 1982, at which time the court took the matter under advisement.

## APPLICABLE LAW

In actions brought against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680, the law to be applied by the court is the law of the place where the alleged negligence occurred. *Richards v. United States,* 369 U.S. 1, 10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962); *Boe v. United States,* 352 F.2d 551, 552 (8th Cir.1965); *Baker v. United States,* 226 F.Supp. 129, 130 (D.C.Iowa 1964), *aff'd* 343 F.2d 222 (8th Cir.1965). Consequently, North Dakota medical malpractice law applies.

Under North Dakota law the burden is upon the plaintiff to prove that the defendant was negligent and that plaintiff's damages were proximately caused by that negligence. *Dick v. Lewis,* 506 F.Supp. 799, 805 (D.N.D.1980), *aff'd,* 636 F.2d 1168 (8th Cir.1981). Generally, a prima facie case of medical malpractice consists of evidence establishing the applicable standard of care, violation of that standard, and a causal relationship between the violation and the harm complained of. *Winkjer v. Herr,* 277 N.W.2d 579, 583 (N.D.1979) (citations omitted).

A physician has an implied obligation arising from his employment to see that no injury results from any lack of care or skill on his or her part. *Benzmiller v. Swanson,* 117 N.W.2d 281, 287 (N.D.1962) citing *Schoening v. Smith,* 59 N.D. 592, 231 N.W. 278 (1930). A physician is required to exercise only such reasonable care and skill as are exercised ordinarily by physicians practicing in similar localities in the same general type of practice. *Winkjer v. Herr,* 277 N.W.2d at 583–84 (citations omitted). Therefore, in the absence of a specific agreement, a physician does not guarantee or insure a good result, or that he or she will effect a cure. *Benzmiller v. Swanson,* 117 N.W.2d at 287 (citations omitted).

Where a medical malpractice case involves issues of a complex medical nature which are not within the common knowledge of laymen, expert medical testimony is essential to support a factual determination

**1210**

by the fact finder that the physician was negligent. *Van Vleet v. Pfeifle,* 289 N.W.2d 781, 784 (N.D.1980) citing *Wasem v. Laskowski,* 274 N.W.2d 219 (N.D.1979). Therefore, evidence as to the degree of care and skill required of a physician in diagnosing or treating an ailment, as well as any departure from that standard, generally must be established by expert testimony. *Winkjer v. Herr,* 277 N.W.2d at 585. Additionally, expert testimony is usually necessary to establish a duty to disclose to a patient the risks involved in treating the ailment. *See Walker v. North Dakota Eye Clinic, Ltd.,* 415 F.Supp. 891, 895 (D.N.D. 1976).

Dr. Virgil Lundquist, plaintiff's expert, testified by deposition that Mr. Lemke's medical records revealed nothing unusual with regard to the way Dr. Iwen approached the operation or the procedure he used during it. However, Dr. Lundquist is of the opinion that the injury to Mr. Lemke's recurrent laryngeal nerve was caused by a departure from the minimum accepted standards of care ordinarily possessed and exercised by surgeons doing an endarterectomy. The basis for Dr. Lundquist's opinion is that the recurrent laryngeal nerve is rarely if ever encountered in the operative site and rarely if ever damaged in this type of operation. In Dr. Lundquist's opinion, the probability of any injury to the nerve occurring is extremely remote if proper care and attention are taken during the operation. However, Dr. Lundquist admitted that his personal experience in the actual performance of this type of surgery was very limited.

The testimony of Dr. Lundquist is not direct or circumstantial evidence of a failure by Dr. Iwen to meet the requisite standards of care and skill. Dr. Lundquist did not attempt to compare the standard in this locality with the procedure used in performing the endarterectomy to demonstrate that it fell short of the standard. The testimony elicited from Dr. Lundquist appears to be an attempt on the part of the plaintiff to invoke the doctrine of res ipsa loquitur.

The doctrine of res ipsa loquitur is a rule of evidence. *Swanson v. Hill,* 166 F.Supp. 296, 299 (D.N.D.1958). It is applicable where "there is no evidence, circumstantial or otherwise, to show negligence apart from the happening of the accident or the infliction of the injury." *Id. quoting Ramsouer v. Midland Valley Railroad,* 135 F.2d 101, 106 (8th Cir.1943). Procedurally the doctrine creates a permissible inference from harmful results that the defendant did not exercise the correct standard of care. *Wasem v. Laskowski,* 274 N.W.2d 219, 224 (N.D.1979).

In order for a plaintiff to rely upon the doctrine of res ipsa loquitur, he or she must establish three elements: 1) the injury is one that would not ordinarily occur absent negligence; 2) the instrumentality or agency that caused the injury must have been within the exclusive control of the defendant; and 3) the injury must not have been due to any voluntary action by the plaintiff. *See United States Rubber Co. v. Bauer,* 319 F.2d 463, 468 (8th Cir.1963); *Bismarck Baptist Church v. Wiedemann Industries, Inc.,* 201 N.W.2d 434, 440 (N.D. 1972); W. Prosser, *Handbook of the Law of Torts,* § 39, at 213–14 (4th ed. 1971).

Courts have been reluctant to apply the doctrine of res ipsa loquitur to medical malpractice cases. In *Schoening v. Smith,* 59 N.D. 592, 231 N.W. 278 (1930), the North Dakota Supreme Court held that the doctrine of res ipsa loquitur does not apply to medical malpractice actions. In *Sagmiller v. Carlsen,* 219 N.W.2d 885, 893 (N.D.1974), however, the supreme court stated the following:

While the doctrine may aid a plaintiff in some medical malpractice cases, and may indeed be used in lieu of expert medical testimony in some such cases, it applies only where the facts showing negligence are within the understanding of laymen, and the probability of the adverse result from the facts shown within the common knowledge of laymen. The rule is stated in the decision of U.S. District Judge Davies, construing North Dakota law, in *Swanson v. Hill,* 166 F.Supp. 296 (D.C.N.D.1958):

"The only exception to the principle that the doctrine of *res ipsa loquitur* may not be invoked in actions for malpractice, consists of cases where the undesirable result is such that it is evident even to a layman and could not have occurred except for the doctor's negligence, as, for instance, when a foreign object is left in a wound after an operation." [Quoted from *Johnston v. Rodis,* D.C. 1957, 151 F.Supp. 345, 346]. *Sagmiller v. Carlsen,* 219 N.W.2d at 893. Therefore, the North Dakota Supreme Court has apparently recognized that in certain types of medical accidents, a fact finder can draw a reasonable inference of negligence based upon the common knowledge and past experiences of the community. *Id. See also Winkjer v. Herr,* 277 N.W.2d at 585.

■ Cases where nerve damage and paralysis have occurred, such as the case at bar, involve complex medical issues. The facts showing negligence are not within the understanding of laymen; neither is the probability of the adverse result from the facts shown within the common knowledge of laymen. The issue of whether expert testimony can be used to provide the foundation for res ipsa loquitur in cases involving complex medical issues has not been addressed by the North Dakota Supreme Court.[1] Even if the supreme court were to expand the application of res ipsa loquitur to actions involving complex medical procedures, the doctrine permits, but does not compel, an inference that the defendant

was negligent. *Wasem v. Laskowski,* 274 N.W.2d at 224.

■ The defendant by its evidence has rebutted any such inference of negligence. The operation was performed utilizing accepted procedures and was done in the same way as Dr. Iwen had done numerous successful operations. Mr. Lemke was the first and only one of Dr. Iwen's patients to suffer this complication. A prospective study of the incidence of nerve injury during endarterectomies admitted into evidence as Exhibit 7 indicates that cranial nerve damage may occur despite gentle dissection and retraction. Mr. Lemke's anatomy in the operative area appeared normal. Neither the vagus nor the recurrent laryngeal nerves were visible during surgery. However, the vagus nerve is visible in only 30 to 40 percent of the procedures and the recurrent laryngeal nerve is rarely seen. When the nerves are not visible during the endarterectomy the surgeon will not probe for, locate or expose them, since such manipulation may cause nerve injury. Both Dr. Iwen and Dr. Cliff Hamilton, defendant's expert, testified that the procedure used by Dr. Iwen was appropriate. Based on a review of Mr. Lemke's medical records, the literature, and his experience, it is Dr. Hamilton's opinion that Dr. Iwen performed in accord with the accepted standards of practice.

■ The evidence establishes that no one really knows exactly how damage to the cranial nerves occurs during an endarterectomy. This complication appears to be

1. Courts in other jurisdictions have held that when complex medical procedures are involved, proof by way of expert testimony that the injury is one that would not ordinarily occur had the defendant exercised proper care will satisfy the plaintiff's burden of production as to the probability element of res ipsa loquitur and thus permit the jury to draw an inference of negligence. *See, e.g., Raza v. Sullivan,* 432 F.2d 617, 620 (D.C.Cir.1970), *cert. denied* 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971); *Walker v. Rumer,* 72 Ill.2d 495, 500–01, 21 Ill.Dec. 362, 365, 381 N.E.2d 689, 691 (1978); *Clark v. Gibbons,* 66 Cal.2d 399, 411–14, 426 P.2d 525, 534–35, 58 Cal.Rptr. 125, 134 (1967). However, conclusory testimony by an expert that there must have been a breach of the duty

of care because there was a bad result will not create a basis for invoking res ipsa loquitur. *Smith v. Reitman,* 389 F.2d 303, 304 (D.D.Cir. 1967). A conclusory statement is insufficient to demonstrate that the injury could not have occurred in the absence of negligence. *Id.* It has been held that the plaintiff will be entitled to invoke the doctrine of res ipsa loquitur if the plaintiff presents expert testimony that, in the expert's opinion, the occurrence complained of ordinarily would not happen in the absence of a breach of duty of care and, in addition to this assertion the expert discusses accepted procedures and explains how negligence may occasionally intrude into these procedures. *See Raza v. Sullivan,* 432 F.2d at 620.

simply an inherent risk of having the operation. A bad result does not by itself furnish a basis for holding the defendant liable or support a finding that he was negligent with respect to diagnosis and treatment. *Winkjer v. Herr,* 277 N.W.2d at 586 (citations omitted). "If a physician's diagnosis and treatment meet applicable standards of care and skill, there is no medical malpractice liability on his part regardless of causation." *Id., citing Bakerink v. Orthopaedic Associates, Ltd.,* 94 Nev. 428, 581 P.2d 9 (Nev.1978). Therefore, even if permitted to invoke the doctrine of res ipsa loquitur, plaintiff has failed to establish that defendant breached its duty of care in performing the surgery.

Although not pleaded, plaintiff alleged at trial that defendant was negligent under the doctrine of informed consent for failing to warn Mr. Lemke that an endarterectomy could cause vocal cord paralysis. North Dakota has adopted the view that "when a 'patient consents to treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information....'" *Winkjer v. Herr,* 277 N.W.2d at 587, *quoting Cobbs v. Grant,* 8 Cal.3d 229, 240–41, 502 P.2d 1, 8, 104 Cal.Rptr. 505, 512 (1972). The North Dakota Supreme Court has not ruled, however, on whether the standard by which this duty is to be measured is "the custom of the physician practicing in the community" or what is "reasonable under the circumstances." *Winkjer v. Herr,* 277 N.W.2d 587–88.

■ In applying either standard of disclosure a physician is not required to disclose all possible risks and dangers of the treatment; only those risks that are significant in terms of their seriousness and likelihood of occurrence need be disclosed. *Winkjer v. Herr,* 277 N.W.2d at 588. "There is no need to disclose risks of little consequence, those that are extremely remote, or those that are common knowledge as inherent in the treatment." *Id. citing*

*Cobbs v. Grant,* 8 Cal.3d at 244–45, 502 P.2d at 11, 104 Cal.Rptr. at 515.

■ Mr. Lemke was informed of the possibility that the endarterectomy could cause a stroke which had the potential of paralyzing one half of his body. The expert testimony at trial revealed that the risk of a stroke occurring during the operation is a well recognized, inherent risk of an endarterectomy. The likelihood of a stroke occurring during an endarterectomy is approximately two to four percent. It is standard medical practice to warn of the risk of stroke because the potential consequences are serious. However, it is not standard practice to warn of possible cranial nerve damage or vocal cord paralysis. Cranial nerve damage and vocal cord paralysis are not considered usual risks of an endarterectomy. Physicians do not warn of all conceivable risks for fear that such discussions will frighten the patient and may cause him to elect not to have necessary surgery. Therefore, Dr. Iwen's failure to disclose the risk of cranial nerve damage to Mr. Lemke prior to surgery was not a breach of his duty to disclose under "the custom of the physician practicing in the community" standard.

Likewise, it is the opinion of this court that disclosure of the risk of vocal cord paralysis would not have affected Mr. Lemke's decision to undergo the treatment. Mr. Lemke chose to go ahead with the surgery knowing there was a chance that he may suffer a stroke during surgery which would paralyze one half of his body. Additionally, even after it was apparent that the January 22 operation had caused his ability to vocalize to be adversely affected, Mr. Lemke chose to go ahead with the second operation, which was also performed by Dr. Iwen. It is apparent that the risk of losing his voice was considered by Mr. Lemke to be outweighed by the possibility that he would sustain a massive stroke and perhaps die if he were to forego the operation. Dr. Iwen's nondisclosure of the risk of cranial nerve damage was "reasonable under the circumstances" and therefore cannot be considered a breach of his duty to disclose under this standard.

## CONCLUSION

The United States, acting through its agents and employees at the Veterans Administration Hospital in Fargo, North Dakota, did not breach its duty of care in either performing the endarterectomy or failing to inform Mr. Lemke of the risk of cranial nerve damage or vocal cord paralysis. Defendant United States is entitled to a dismissal of plaintiff's complaint and cause of action.

## ORDER FOR JUDGMENT

IT IS ORDERED that judgment be entered for the dismissal of plaintiff's complaint and cause of action.