Dean WINKJER, Plaintiff and Appellant,

v.

John HERR, Defendant and Appellee.

Civ. No. 9519.

Supreme Court of North Dakota.

April 4, 1979.

Rehearing Denied April 24, 1979.

Dean Winkjer, Williston, plaintiff and appellant, pro se.

Zuger & Bucklin, Bismarck, for defendant and appellee; argued by Leonard H. Bucklin, Bismarck.

SAND, Justice.

Plaintiff, Dean Winkjer, appealed from a judgment dismissing with prejudice his medical malpractice action against the defendant, Dr. John Herr. Summary judgment was granted in favor of the defendant on the grounds the plaintiff failed to demonstrate he had expert medical testimony to establish defendant was negligent in the diagnosis and treatment of the plaintiff, and that plaintiff failed to demonstrate he had any evidence there was any known risk involved in a specific treatment as to give rise to a duty in the defendant to inform the plaintiff of that risk. We affirm.

According to the medical records and a sworn summary of the medical history of this case submitted by the defendant, plaintiff first contacted the defendant on 22 February 1974. Plaintiff desired to wear contact lenses and sought the opinion of the defendant, a certified ophthalmologist, on whether or not soft contact lenses would cause damage to his eyes. Although plaintiff was assured he could wear soft contacts, the defendant observed that the intraocular pressure of plaintiff's eyes was

elevated. Intraocular pressure was also elevated during a subsequent examination conducted in May 1974. Plaintiff returned to the defendant in August 1974 and the pressure was still high. Defendant diagnosed plaintiff's condition as glaucoma and prescribed a 1.0% solution of pilocarpine. Also on this date the record indicates defendant observed evidence of early posterior subcapsular changes in both eyes.

Because of blurred vision and other general discomforts caused by the pilocarpine, plaintiff's treatment was changed to a 0.03% solution of phospholine iodide administered twice daily. In October 1974 plaintiff's prescription was changed to a 0.06% solution of phospholine iodide administered once daily. A 0.03% solution of phospholine iodide administered twice a day was tried from 15 November 1974 to 29 November 1974 when plaintiff was again returned to a 0.06% solution of phospholine iodide.

Plaintiff was asked to return to the defendant's office in January 1975 because the defendant told him there was evidence that phospholine iodide could cause the formation of cataracts. The use of phospholine iodide in the treatment of the plaintiff was discontinued on 17 January 1975 and pilocarpine was again prescribed. On this date plaintiff was told he had developing cataracts. Plaintiff contended in an affidavit submitted to the district court that on the same date defendant also told him the phospholine iodide had caused the cataracts. In both his trial and appellate briefs, defendant denied making this latter statement. (As discussed later herein, even if we assume the statement was made it would not be dispositive of the issue of negligence.)

Through the mutual consent of the plaintiff and the defendant, plaintiff was examined by Dr. Richard Brubaker, a noted specialist in the field of glaucoma, at the Mayo Clinic in Rochester, Minnesota. After examining the plaintiff, Dr. Brubaker recommended to the defendant that plaintiff be removed from glaucoma control drugs. In September 1975 it was necessary for plaintiff to undergo cataract surgery to both eyes.

This action was commenced by summons and complaint in September 1976. The defendant served interrogatories on the plaintiff which requested, among other things, the names of any experts who had investigated the matter and the substance of their opinions. Request was also made that the interrogatories be supplemented in accordance with Rule 26(e), North Dakota Rules of Civil Procedure, if new information was obtained or the original answers were no longer correct. Plaintiff answered he had not consulted or arranged with any medical witnesses in connection with the action. That answer was not supplemented at the time of the summary judgment.

A motion for summary judgment was filed by the defendant on 13 September 1977. The motion was supported by the affidavits of the defendant and Dr. Thomas Ellingson, a Bismarck ophthalmologist specializing in the treatment of cataracts, and also by the depositions of Dr. Brubaker, and Dr. Donald Doughman, a certified ophthalmologist from the University of Minnesota Hospitals who examined Winkjer in October 1976. Plaintiff resisted the motion through affidavits of his own, a certificate from the Food and Drug Administration, and the plaintiff's medical records made by the defendant. The hearing on the motion was held on 12 October 1977, after which the district court announced withholding final decision until 14 November 1977, during which time plaintiff would be allowed to submit additional materials. On 10 November 1977 plaintiff filed a motion requesting the court to reopen the record and allow the submission of added materials. This motion was heard on 12 December 1977, at which time the court received the additional materials the plaintiff submitted and also granted him extended time to submit any supplemental briefs.

An order granting defendant's motion for summary judgment was filed on 12 April 1978 and judgment was entered accordingly. The plaintiff appealed from the judgment and has raised the following issues:

(1) Must plaintiff have available expert testimony to submit to the trier of facts on the standard of care in the diagnosis and treatment of glaucoma;

(2) Did defendant, under the circumstances of this case, have a duty to warn plaintiff of a cataractous risk of treatment with phospholine iodide?

■ . The party who moves for summary judgment has the burden of clearly showing there is no genuine issue of a material fact to be determined. A motion for summary judgment will be granted only if after construing the evidence in favor of the party (in the light most favorable to the party) against whom summary judgment is sought, it appears there is no genuine issue of fact and the movant is entitled to judgment as a matter of law. Rule 56, NDRCivP; *Sagmiller v. Carlsen,* 219 N.W.2d 885 (N.D.1974); *Ray v. Northern Sugar Corporation,* 184 N.W.2d 715 (N.D. 1971); *Temme v. Traxel,* 102 N.W.2d 1 (N.D.1960).

■ Whenever a motion for summary judgment is made and supported by affidavits and documentary evidence establishing a prima facie showing that no genuine issue of fact exists and that the movant is entitled to summary judgment as a matter of law, an adverse party may not rest on the mere allegations or denials of his pleadings, but his response, by affidavit or as otherwise provided by Rule 56, NDRCivP, must set forth specific facts showing there is a genuine issue for trial. The party moved against cannot defeat a showing of no genuine issue of fact by a mere assertion that an issue of fact exists, but must back it up

with a reasonable showing that sufficient evidence is available to justify trial. *Ray v. Northern Sugar Corporation, supra; Felt v. Ronson Art Metal Works,* 107 F.Supp. 84 (D.C.Minn.1952).

■ The first question to be examined is whether or not the showing made by the movant, without regard to whether or not or how the opposing party has responded, demonstrates there is no genuine issue as to any material fact and as a result a party is entitled to a judgment as a matter of law. *Sagmiller v. Carlsen, supra.* The burden of proving the existence of a genuine issue of fact is not shifted to the opposing party until the movant has successfully met his burden of showing the nonexistence of such issues of fact. *Holl v. Talcott,* 191 So.2d 40 (Fla.1966).

■ Generally, a prima facie case of medical malpractice must consist of evidence establishing the applicable standard of care, violation of that standard, and a causal relationship between the violation and the harm complained of. *Haven v. Randolph,* 161 U.S.App.D.C. 150, 151, 494 F.2d 1069, 1070 (1974); *Kosberg v. Washington Hospital Center, Inc.,* 129 U.S.App. D.C. 322, 394 F.2d 947 (1968).

Defendant in this case contended there was no genuine issue of fact as to the applicable standard of care or as to the violation of that standard.

■ A physician is required to exercise such reasonable care and skill as are exercised ordinarily by physicians practicing in similar localities [1] in the same general line

---

1. We recognize the locality requirement has in recent years been criticized or rejected in a number of jurisdictions.

"Modern systems of transportation and communication, plus a proliferation of literature, seminars and post-graduate courses, make it possible for all practitioners to be reasonably familiar with current medical advances." *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676, 682 (1972).

By reciting the rule as to the standard of care required of physicians as announced by this court on prior occasions, we by no means intimate the position this court would follow were the specific issue of the locality requirement before us. The locality rule in an instance may

have application but not in another; each case would rest on its merits. We note that two ophthalmologists whose depositions were relied upon by the defendant in support of his motion for summary judgment do not practice in communities similar to the defendant's. These physicians were, however, plaintiff's own treating physicians. Also these physicians did not limit their opinion to the standard of care in a particular locality. In addition, in support of his motion for summary judgment, defendant introduced the affidavit of a Bismarck ophthalmologist who would be considered practicing in a locality similar to the defendant's.

of practice. *Benzmiller v. Swanson,* 117 N.W.2d 281 (N.D.1962); *Stokes v. Dailey,* 97 N.W.2d 676 (N.D.1959); *McDonnell v. Monteith,* 59 N.D. 750, 231 N.W. 854 (1930); *Whitson v. Hillis,* 55 N.D. 797, 215 N.W. 480 (1927).

Defendant in this case diagnosed the plaintiff as having glaucoma and prescribed pilocarpine and phospholine iodide for the treatment of that disease. Defendant's evidence, in the form of depositions and affidavits offered in support of his motion for summary judgment, demonstrated that glaucoma is characterized by increased intraocular pressure sufficient to cause optic disc damage eventually resulting in blindness. This disc damage and resulting blindness in today's medical knowledge is thought to be irreversible. The depositions and affidavits disclosed that some persons can have elevated intraocular pressure with no resulting disc damage. These persons are termed as having ocular hypertension for which generally no treatment is prescribed as there is no resulting injury. Although there may in some cases be characteristics commonly associated with glaucoma that are not found in ocular hypertension, the only sure method of distinguishing if a person with elevated intraocular pressure has glaucoma or ocular hypertension is through a test of time to determine if there is subsequent ocular disc damage.

The depositions of Dr. Brubaker and Dr. Doughman point out the higher degrees of damage caused by glaucoma are usually preventable if the disease is diagnosed and treated early enough as to prevent disc damage. The usual treatment for glaucoma is the use of various drugs which reduce the intraocular pressure. Defendant's experts stated people experience various degrees of difficulty and discomfort with each of these drugs and thus different drugs in various dosages are tried to find a combination most suitable to a particular patient. They also stated in their depositions that pilocarpine is probably the most common first-prescribed drug for treating glaucoma and phospholine iodide is one of a number of drugs which are often tried second.

Plaintiff alleged that defendant's diagnosis of and treatment for glaucoma was negligent because plaintiff actually had ocular hypertension. Defendant's experts in their depositions and affidavits agreed, however, that defendant's diagnosis of and treatment for glaucoma was proper. The depositions and affidavits set forth that in addition to having elevated intraocular pressure, plaintiff was a myope and not only is glaucoma more common in myopes but also a myope having elevated intraocular pressure is more likely to have subsequent damage to his optic serve. Also, plaintiff's mother had glaucoma and it is known that if there is a history of glaucoma in a family there is an increased likelihood that a given individual will have glaucoma and if that history is on the maternal side the probability increases even further, the experts stated in their depositions there are also a number of judgmental factors which affect a physician's decision on whether or not a patient has glaucoma such as excessive pigmentation, the shape of the optic disc, whether or not the discs are symmetric or if there have been changes in the discs over a period of time. The defendant was required to exercise several of these judgmental factors at the time he made his diagnosis of the plaintiff. Based upon these various indications of glaucoma, the experts stated the defendant's decision to treat the plaintiff for glaucoma rather than wait and watch whether or not plaintiff developed disc damage was proper.

Although the foregoing is but a summary of the statements made by the defendant's experts in explanation of their opinions that defendant's diagnosis and treatment met the necessary standards of care and skill, we conclude this information, combined with other information offered by the defendant's experts in their depositions and affidavits was sufficient to show there was no genuine issue of whether or not defendant exercised the proper degree of care and skill and thus shifted the burden of proving the existence of a genuine issue of fact to

the plaintiff. We now examine plaintiff's argument to determine if he met that burden.

 Evidence as to the degree of care and skill required of a physician in diagnosing or treating one's ailment, as well as any departure from that standard, must generally be established by expert testimony. Annot. 81 A.L.R.2d 597 (1962). Thus one claiming medical malpractice cannot ordinarily have his case submitted to a jury without expert testimony supporting his claim of professional negligence. The exception to this general rule is "such expert testimony is not necessary where the matters to be proved fall within an area of common knowledge and developing lay comprehension of medical techniques and where the results of surgical or medical treatment, viewed in light of all the circumstances, provide a sufficient evidentiary basis to support an inference of negligence." *Hestbeck v. Hennepin County,* 297 Minn. 419, 212 N.W.2d 361, 364 (1973); *Wasem v. Laskowski,* 274 N.W.2d 219 (N.D.1979); *Stokes v. Dailey,* 85 N.W.2d 745 (N.D.1957); *Whitson v. Hillis,* 55 N.D. 797, 215 N.W. 480 (1927); *Roberson v. Christoferson,* 65 F.R.D. 615 (D.N.D.1975). The rule as to the proper standard of care and skill is but an adaptation of the general standard of negligence to a group required to act as reasonable men possessing their medical talents presumably would. *Canterbury v. Spence,* 150 U.S.App.D.C. 263, 464 F.2d 772 (1972), *cert. denied* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518. Thus where a physician's activity constitutes a blunder so egregious that a layman is capable of comprehending its enormity, medical testimony is not necessary to test the propriety of that activity. *Walker v. North Dakota Eye Clinic, Ltd.,* 415 F.Supp. 891 (D.N.D.1976).

Plaintiff argued that defendant's prescription of phospholine iodide for plaintiff's condition, which time has proven was ocular hypertension, was a blunder so egregious a layman is capable of comprehending its enormity without the assistance of expert medical testimony. In support of his argument, plaintiff offered a letter that was written in January 1976 by the defendant at the request of the plaintiff to the Federal Aviation Administration stating that defendant's diagnosis of plaintiff's condition had changed from chronic open angle glaucoma to ocular hypertension. Plaintiff also offered statements from the physicians desk reference, warnings from the Food and Drug Administration's clearance of phospholine iodide, and instructions for administration accompanying the drug, that phospholine iodide was not recommended for ocular hypertension.

Plaintiff argued the above evidence makes this case one in which expert testimony is not necessary. In support of his argument, plaintiff relied on a relatively recent Minnesota Supreme Court opinion. In that case the Minnesota Court stated:

"Where a drug manufacturer recommends to the medical profession (1) the conditions under which its drug should be prescribed; (2) the disorders it is designed to relieve; (3) the precautionary measures which should be observed; and (4) warns of the dangers which are inherent in its use, a doctor's deviation from such recommendations is prima facie evidence of negligence . . . ." *Mulder v. Parke Davis & Co.,* 288 Minn. 332, 339–340, 181 N.W.2d 882, 887 (1970).

See also, *Ohligschlager v. Proctor Community Hospital,* 55 Ill.2d 411, 303 N.E.2d 392 (1973); *Sanzari v. Rosenfeld,* 34 N.J. 128, 167 A.2d 625 (1961).

 Although plaintiff may be correct in his contention that the published warnings and recommendations, combined with the common knowledge doctrine, may have been sufficient to present a prima facie case of negligence in the prescription of phospholine iodide for a diagnosis of ocular hypertension, those are not the facts of this case. Rather, there was a prescription for a condition diagnosed as glaucoma. Expert statements in the form of depositions agreed, and plaintiff's published material was not to the contrary, that phospholine iodide is a proper drug to be used in the treatment of glaucoma. The real issue, then, is whether or not defendant was neg-

ligent in diagnosing glaucoma as plaintiff's condition which time has shown was actually ocular hypertension. Treatment of a patient with the right drug for the wrong disease is not negligence unless the diagnosis of the disease was negligent. The mere fact that a physician was mistaken in his diagnosis is not alone sufficient to warrant a finding of negligence.

In the present case, defendant's experts through their depositions stated their agreement that the diagnosis and treatment of plaintiff's condition as glaucoma was not only reasonable but proper. The published material offered by the plaintiff did not constitute evidence of the standard of care to be exercised by the defendant in diagnosing the plaintiff or that there was a deviation from the standard.

 Plaintiff argued the statements made by the defendant in January 1975, i. e., that plaintiff's cataracts were caused by the phospholine iodide, supplies the expert testimony he needs to avoid a summary judgment. Although defendant in his briefs denied making the statement, we must assume it was made for purposes of this review. *Ray v. Northern Sugar Corporation,* 184 N.W.2d 715 (N.D.1971).

 Generally, plaintiffs in malpractice actions should be permitted to cross-examine a defendant as an expert concerning the standard of care and skill ordinarily exercised by doctors in the community. *Iverson v. Lancaster,* 158 N.W.2d 507 (N.D.1968); 61 Am.Jur.2d *Physicians, Surgeons, Etc.* § 205. Consequently, it is possible for a plaintiff to establish a standard of care and skill through a defendant's own testimony and thereby make out a prima facie case. In this case if inculpatory declarations of negligence were made by the defendant, they could be deemed necessary expert testimony to avoid a summary judgment. However, the declaration of the defendant was not an admission of negligence but a "statement" of causation. See, *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972).

 Defendant's statement, if made, that plaintiff's cataracts were caused by the phospholine iodide goes to the element of proximate cause. It does not establish a standard of care or that a standard of care was not met and as such does not refute defendant's showing through expert testimony that defendant was not negligent in his diagnosis and treatment of plaintiff. A bad result does not by itself furnish a basis for holding the defendant liable or support a finding that he was negligent with respect to the diagnosis and treatment. *Wasem v. Laskowski,* 274 N.W.2d 219 (N.D. 1979). See, *Perin v. Hayne,* 210 N.W.2d 609 (Iowa 1973); *Block v. McVay,* 80 S.D. 469, 126 N.W.2d 808 (1964). If a physician's diagnosis and treatment meet applicable standards of care and skill, there is no medical malpractice liability on his part regardless of causation. See, *Bakerink v. Orthopaedic Associates, Ltd.,* 581 P.2d 9 (Nev. 1978).

Plaintiff stated in his affidavit that Dr. Brubaker recommended the discontinuance of medication for the treatment of glaucoma after a one-day examination. Plaintiff argued that Dr. Brubaker's examination and recommendation offers an inference sufficient to avoid a summary judgment. Dr. Brubaker in his deposition said, however, that his recommendation was not predicated on any belief that the diagnosis of glaucoma by the defendant was incorrect. Although he thought there was uncertainty as to the diagnosis of glaucoma, Brubaker said his recommendation was based on the combined difficulty plaintiff experienced from the phospholine iodide and the development of cataracts. He thought it was better to take a chance with glaucoma and let plaintiff see better until the time cataract surgery was necessary. Brubaker's explanation of his recommendation refutes any inference therefrom that defendant's original diagnosis was negligently made.

 We conclude the factors relied upon by the defendant in the diagnosis and treatment for glaucoma were not those commonly susceptible of understanding by

a lay person without the assistance of expert medical testimony. We also conclude plaintiff has failed to meet his burden of refuting the showing made by the defendant that there was no genuine issue of fact that defendant's diagnosis and treatment was not carried on with the required degree of due care and skill.

Plaintiff also alleged defendant was negligent under the doctrine of informed consent for not warning the plaintiff that treatment with phospholine iodide could cause cataracts.

█ Whenever a plaintiff alleges a potential complication arose from a known but undisclosed risk, the occurrence of which was not an integral part of the treatment procedure, the courts are divided on whether the action should be deemed a battery or negligence. Although there is authority to the contrary, we find persuasive the modern trend that in cases such as this when a "patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information" and as such any action on that failure should be termed one in negligence. *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 512, 502 P.2d 1, 8 (1972); *Cornfeldt v. Tongen,* 262 N.W.2d 684 (Minn.1977).

█ A major element of any negligence action is the existence and extent of a duty owed the defendant by the plaintiff. Generally there exists as an integral part of the physician's overall obligation to his patient the duty of reasonable disclosure of the available choices with respect to the proposed therapy and of the material and known risks potentially involved in each. See *Wasem v. Laskowski, supra.* A more difficult question arises in this case as to the extent of the duty and the standard by which it should be measured.

**2.** A list of cases expressly or impliedly adopting the objective theory of informed consent is contained in footnote 12 of the Minnesota case,

The majority of the courts have related the duty to the custom of the physician practicing in the community. Annot. 52 A.L.R.3d 1084 (1973). It is said a physician's duty is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances. 61 Am.Jur.2d *Physicians, Surgeons, Etc.,* § 154. This has necessitated the need for expert medical evidence as to what a reasonable medical practitioner of the same school practicing under the same or similar circumstances would have disclosed to his patient about the risks incident to a proposed treatment. *Roberson v. Christoferson,* 65 F.R.D. 615 (D.N.D.1975); *Marchlewicz v. Stanton,* 50 Mich.App. 344, 213 N.W.2d 317 (1973); Annot., 52 A.L.R.3d 1084 (1973); 61 Am.Jur.2d, *Physicians, Surgeons, Etc.,* § 154.

A growing number of jurisdictions[2] have adopted the persuasive reasoning of the lead case of *Canterbury v. Spence,* 150 U.S. App.D.C. 263, 464 F.2d 772 (1972), *cert. denied* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 stating that although a physician's noncompliance with the professional custom to reveal, like any other departure from prevailing medical practice, may give rise to liability to the patient, a patient's cause of action is not limited to the existence and nonperformance of a relevant professional tradition. These courts have stated a patient's right of self-determination in particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves. As stated in *Canterbury* at page 276, 464 F.2d at page 785:

"In sum, the physician's duty to disclose is governed by the same legal principles applicable to others in comparable situations, with modifications only to the extent that medical judgment enters the picture. We hold that the standard measuring performance of that duty by physicians, as by others, is conduct which is

*Cornfeldt v. Tongen,* 262 N.W.2d 684, 700 (Minn.1977).

reasonable under the circumstances." [Footnotes omitted.]

And at pages 277 and 278, 464 F.2d at pages 786 and 787:

"Thus the test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked." [Footnote omitted.]

Also, in *Cornfeldt v. Tongen, supra,* at page 702, we find:

"Failure to disclose a risk that would have been disclosed under accepted medical practice thus should be a sufficient, but not a necessary, condition of liability. No reason appears to justify withholding information from a patient, in light of his right to self-determination, if medical practice dictates disclosure. But even if his disclosure conforms to accepted medical practice, a physician nevertheless should be liable if he fails to inform the patient of a significant risk of treatment or of an alternative treatment."

Under this line of authority, expert testimony as to the standard of disclosure is generally received as relevant evidentiary material, however, such testimony merely supplements and does not define the legal duty to inform which exists as a matter of law. *Congrove v. Holmes,* 66 Ohio Op.2d 295, 37 Ohio Misc. 95, 308 N.E.2d 765 (1973); *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676 (1972); *Canterbury v. Spence, supra.* Such expert testimony is not necessarily required:

"When there is medical testimony which establishes that a risk is material, that alternatives are feasible, and that disclosure of the risk will not be detrimental to the particular patient, we find no reason why expert medical testimony should be required to establish the existence of a duty to disclose such risks. This is not a medical matter. Once materiality, feasibility and the effect of a disclosure on the patient is established by expert testimony, what physicians disclose or do not disclose in a particular locality about the risks and feasible alternatives of certain proposed treatment or surgery,

if there is any standard practice, must be a happenstance because medical training and experience would be of little assistance on this aspect of the problem." *Getchell v. Mansfield,* 260 Or. 174, 489 P.2d 953, 956 (1971).

Plaintiff urged us to adopt this minority position as to the lack of necessity for expert medical testimony in informed consent cases.

■■■ Under either an objective or subjective duty of disclosure, expert medical testimony is generally necessary to identify the risks of treatment, their gravity, likelihood of occurrence, and reasonable alternatives. *Cornfeldt v. Tongen, supra; Downer v. Veilleux,* 322 A.2d 82, 92 (Me.1974); *Canterbury v. Spence, supra.* The necessity for expert testimony is particularly so when such information is outside the common knowledge of laymen.

■■■ A duty to disclose can arise only if the physician knew or should have known of the risks to be disclosed. *Cornfeldt v. Tongen, supra.* Also, a physician is not required to disclose all possible risks and dangers of the proposed procedure but only those that are significant in terms of their seriousness and likelihood of occurrence. There is no need to disclose risks of little consequence, those that are extremely remote, or those that are common knowledge as inherent in the treatment. *Cobbs v. Grant, supra,* 104 Cal.Rptr. at 515, 502 P.2d at 11. If a risk was not known to exist, clearly a physician cannot be held liable for failure to inform his patient.

■■■ Defendant's experts in their depositions and affidavits agreed that although there was evidence that phospholine iodide was cataractous, there was no evidence indicating phospholine iodide was cataractous in the levels and lengths of time prescribed by the defendant. They stated on the basis of studies conducted on the subject, development of cataracts in patients using phospholine iodide appeared to be related to the dose and length of time prescribed. The experts said although it may be possible cataracts could develop from the use of

phospholine iodide in the strengths and lengths of time it was used by the plaintiff, it was highly unlikely and actually unheard of. Because the depositions and affidavits established there was no known risk of phospholine iodide causing cataracts in the doses and lengths of time prescribed for the plaintiff, we need not reach the issue of determining if medical expert testimony is required to show a standard of disclosure among the medical profession.

The plaintiff did not offer expert testimony to refute the showing of the defendant that there was no genuine issue of fact as to a known risk to be disclosed. Even if we consider the material offered by the plaintiff that phospholine iodide was cataractous, that information does not indicate at what levels and over what length of time the drug has been shown to possibly cause cataracts. There can be no liability for a physician to disclose a risk that was unknown in the manner in which a particular drug or treatment was prescribed.

We are well aware of the contention that the reluctance of the members of the medical profession to testify against a fellow physician makes the search for a medical expert very difficult and nearly impossible in some cases. For this reason we agree with those appellate courts which have stated trial courts should be extremely cautious in entering summary judgment in medical malpractice cases because of a lack of expert testimony. See *Sanders v. Frost,* 112 Ill.App.2d 234, 251 N.E.2d 105 (1969). Yet it is apparent in this case that the issues of whether or not defendant exercised the proper degree of care and skill in diagnosing plaintiff's condition and if there was a significant known risk of phospholine iodide causing cataracts, required more than common knowledge and experience to understand and thus were not within the common comprehension of laymen as to not require the necessity of expert testimony.

Summary judgment was entered in this case nearly 19 months after the action was started and over 7 months after the motion for summary judgment was made. During that time plaintiff was given several opportunities to present even one expert witness to support his allegations and to refute the showing made by the defendant that there were no genuine issues of fact. Because plaintiff failed to indicate he had expert medical opinion to sustain his allegations or that he would be able to obtain such opinion in the future, and because the defendant met all the requirements of showing no genuine issue of fact, the granting of summary judgment in this action was proper.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.