Marie Annette ANDERSON, Individually and as Parent and Natural Guardian of Casey Wayne Anderson; and Claudette Schott, Individually and as Legal Guardian of the Person and Estate of Casey Wayne Anderson, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. A1–88–079.

United States District Court,
D. North Dakota,
Southwestern Division.

Feb. 14, 1990.

James J. Ryan and Susan C. Weingartner of Doherty, Rumble & Butler, St. Paul, Minn., for plaintiffs.

Cameron W. Hayden and Clare R. Hochhalter, Asst. U.S. Attys. of U.S. Attorney's Office, Bismarck, N.D., for defendant.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

### INTRODUCTION

On September 9, 1986 Marie Anderson, her mother Claudette Schott and Anderson's son, Casey Anderson, initiated a claim against the United States, the defendant in this case. Anderson claims damages for medical malpractice which allegedly occurred in a medical facility run by the United States on the Standing Rock Indian Reservation in North Dakota. Anderson's claim was denied by a letter dated March 29, 1988 and Anderson consequently initiated this suit. The complaint against the United States was filed on April 29, 1988. On July 1, 1988 the United States filed an answer to this complaint. The United States denies that it is responsible for Casey Anderson's injuries. This Court has jurisdiction in this case pursuant to 28 U.S.C. § 1346 and §§ 2671 through 2680. Anderson's medical malpractice claim is filed pursuant to the Federal Tort Claims Act 28 U.S.C. §§ 2671 through 2680. A bench trial was held for this case in November and December of 1989.

### FACTS

Casey Wayne Anderson was born to Marie Annette Anderson on September 12, 1984 at the Fort Yates Indian Health Service Hospital, North Dakota. This hospital is operated by the Indian Health Service for the United States, the defendant in this case. The IHS was set up by the Indian Health Care Improvement Act. *See* 25 U.S.C. §§ 1601, 1602, 1603, 1611–15, 1621, 1631–33, 1651–58, 1661, 1671–75 (1988). Marie Anderson, Casey Anderson, and Claudette Schott, the plaintiffs, claim that Marie Anderson's labor was complicated by untreated hypertension and preeclampsia. This hypertension and preeclampsia is claimed to have resulted in a lack of oxygen to the fetus, Casey Anderson. As a result, plaintiffs claim Casey Anderson suffered severe and permanent brain injuries.

Marie Anderson arrived at the Fort Yates Indian Health Service Hospital, a level one health care facility, at 12:30 a.m. on September 12, 1984. The term "level one" refers to the level of sophistication of care offered by a health center. A level one hospital provides the lowest level of care available, while a level three hospital is equipped to deal with any emergency. In the context of a birthing center, a level one unit should work only with those pregnancies that are expected to be low risk.

Traditionally the United States has not regarded medical care on reservations as a high priority concern. In response to this problem, the United States created the Indian Health Service in 1976.[1] The Indian Health Service is charged with improving the health care available to the American Indian population. Many American Indians, especially those who live on or near reservations, dwell in geographically isolated areas. Consequently, providing adequate care is often a serious logistical problem. The IHS must make difficult decisions as to the best method to provide the most care to the most people. An impor-

---

1. *See* 25 U.S.C. § 1601 (1989 Supp.). An early example of government intervention into the health care of the American Indian may be found in the journal of the Corps of Discovery.

tant part of the IHS's strategy has been the establishment of level one health care facilities in isolated communities. The IHS has found that when care is provided on a local level, it is much more likely that the American Indian population will receive it. When people who require more intensive care approach a level one facility, the facility protocol requires that the need for greater care be recognized and the patient moved to a higher level hospital.

In the context of this case, this protocol is crucial. For Marie Anderson to be successful in her claim against the United States, she must prove two things. First, that she exhibited warning signs of a condition consisting of Pregnancy Induced Hypertension (PIH), or preeclampsia, or both, and that these signs were ignored. Secondly, she must be able to show that the negligent act of non-diagnosis caused the condition of her son Casey.

Marie Anderson became aware of her pregnancy during the second month of her term. She was nineteen years old and single. Afraid of her parent's reaction to the news of her pregnancy, she concealed it from them for another month. Eventually, Anderson informed her mother, Claudette Schott, that she was pregnant. Schott is of approximately half Sioux ancestry, and is a registered member of the Sioux tribe. As such, her daughter Marie Anderson is entitled to free care at the Fort Yates Indian Health Service Hospital. Schott arranged immediately for her daughter to begin receiving prenatal care through the Fort Yates Hospital.

Marie Anderson was initially examined by Dorothy Meyer, a nurse mid-wife. Nurse Meyer is an employee of the Indian Health Service and is qualified to deliver babies in low-risk pregnancies. In all, Marie Anderson had eight prenatal visits. This was a high number of such examinations compared to that received by the average patient at the Fort Yates Hospital. Nurse Meyer and others were well able to examine Marie Anderson and monitor the care she took of herself during the term of her pregnancy. By all accounts, Marie Anderson's behavior during her pregnancy was exemplary. She neither drank alcohol nor used drugs. She abstained from smoking cigarettes. Marie Anderson faithfully met with Nurse Meyer and other health care professionals and followed their advice. As this was Anderson's first pregnancy, she met once with Dr. Montz, a licensed physician specializing in obstetrics and gynecology, and a consultant for the Fort Yates facility. Montz told Anderson that she was progressing well and that it looked as though the baby would be a boy.

The Fort Yates Hospital is not equipped with an operating room for cesarian sections, anesthesia equipment, or the ability to give a patient blood. This is not consistent with the policy of the American College of Obstetricians and Gynecologists (ACOG), which recommends all of these services be available within thirty minutes in any level one facility. The nearest level three hospital to Fort Yates is located seventy-three miles away in Bismarck, North

In that journal Meriwether Lewis, on 11 February 1805, at Fort Mandan, has this entry:

about five oclock this evening one of the wives of Charbono was delivered of a fine boy. it is worthy of remark that this was the first child which this woman had boarn and as is common in such cases her labour was tedious and the pain violent; Mr. Jessome informed me that he had freequently administered a small portion of the rattle of the rattlesnake, which he assured me had never failed to produce the desired effect, that of hastening the birth of the child; having the rattle of a snake by which I gave it to him and he administered two rings of it to the woman broken in small pieces with the fingers and added to a small quantity of water. Whether this medicine was truly the cause or not I shall not undertake to determine, but I was informed that she had not taken it more than ten minutes before she brought forth perhaps this remedy may be worthy of future experiments, but I must confess that I want faith as to its efficacy.—

M. Lewis, 3 *The Journals of the Lewis & Clark Expedition: August 25, 1804—April 6, 1805* 291 (1987). The child described by Lewis was Jean Baptiste Charbonneau. Young Charbonneau had a lengthy and varied career on the frontier. William Clark, the other leader of the expedition, later offered to educate the boy, known as "Pompy". Clark took Pompy into his own home in St. Louis when the child was about six. He later became a mountain man and fur trader, serving as a guide for explorers and soldiers such as John C. Fremont, Philip St. George Cooke, W.H. Emorty, and James Abert. *Id.*

Dakota. The level three hospital in Bismarck can usually be reached in about one hour from Bismarck by use of an air ambulance.

In North Dakota, "a physician is required to exercise such reasonable care and skill as are exercised ordinarily by physicians practicing in similar localities in the same general line of practice." *Hopkins v. McBane*, 427 N.W.2d 85, 86 (N.D.1988) (citing *Winkjer v. Herr*, 277 N.W.2d 579, 583–84 (N.D.1979)). To establish a prima facie case of medical malpractice in North Dakota, a plaintiff must establish, "the applicable standard of care, violation of that standard, and a causal relationship between the violation and the harm complained of." *Id.* at 86 (citing *Winkjer v. Herr*, 277 N.W.2d at 583).

A hospital may also be held negligent under North Dakota law. *See Nelson v. Trinity Medical Center*, 419 N.W.2d 886, 891 (N.D.1988). Patients enter a hospital under the reasonable assumption that its trained staff, its responsible supervision, and its special equipment will enhance the administration of care prescribed by their physicians. *Id.* at 891 (citing *Swigerd v. City of Ortonville*, 246 Minn. 339, 75 N.W.2d 217, 220 (1956)). A hospital is thus liable for the negligence of its employees in performing even administrative or clerical acts. *Id.* Negligence in their performance may be imputed to the hospital. *Id.*

ISSUES

I. Whether Marie Anderson had warning indications of Pregnancy Induced Hypertension, Preeclampsia, or both.

II. Whether Marie Anderson's alleged conditions of Pregnancy Induced Hypertension, Preeclampsia, or both caused Casey Anderson to suffer intrapartum asphyxia.

III. Damages.

IV. Whether the damage award should be offset by amounts not allowable under the Federal Tort Claims Act.

DISCUSSION

I. *Whether Marie Anderson had warning indications of Pregnancy Induced Hypertension, or Preeclampsia, or both.*

█ When Marie Anderson presented herself at 12:30 A.M. as being in labor at the Fort Yates Hospital, her blood pressure registered at 150/90. Her baseline, or prepregnancy, blood pressure readings had been charted by Nurse Meyer at 100/60. Over the night her blood pressure was measured at 142/88, 140/80, 120/84, 122/80, 120/78, 138/88, and 140/90. Several times during the testimony given at trial the employees of the Fort Yates Hospital indicated confusion as to what blood pressures should be used as the baseline blood pressure. This confusion contributed to the failure of the Fort Yates staff to diagnose Marie Anderson's potential problems.

Marie Anderson claims that when she arrived at the Fort Yates Hospital she was suffering from Pregnancy Induced Hypertension (PIH). PIH is a condition that involves constriction of the placental blood vessels allowing less oxygen to the fetus. This lack of oxygen can permanently destroy brain cells. Even mild hypertension can cause hypoxia and asphyxia. PIH in a laboring patient, even if only mild hypertension, can therefore constitute a high-risk condition for her and her fetus. ACOG defines PIH as a blood pressure reading of 140/90 or greater, or an increase of 30 mms. in the systolic, or an increase of 15 mms. in the diastolic, on two occasions more than six hours apart.

At trial, Anderson suggested that the IHS was negligent because it constructed a facility beyond the thirty-minute distance from a level three facility suggested by ACOG. This Court finds the IHS decision to put level one facilities in isolated rural communities to be a reasonable, and indeed a commendable decision. The ACOG guidelines, in and of themselves, are fine, presenting a thoughtful and reasoned approach to the perils of childbirth. The IHS, however, is faced with the reality that human and economic resources are limited. These limitations do not allow all level one birthing centers to be built within thirty minutes of level three centers, at least not if the IHS wants to have birthing centers located near an indigent and isolated American Indian community. The IHS has cor-

rectly decided that its most important priority is to get the American Indian population into the health-care system. Once the American Indian population receives regular medical attention, those with more serious problems can be identified and transferred to a more sophisticated facility. In such a system, the identification of those termed high risk depends upon the recognition of distress signals. In Marie Anderson's case, this would entail indications that her laboring process might require assistance not available at the Fort Yates Hospital. Those services not available at Fort Yates which are commonly needed in high-risk pregnancies include anesthesia, blood, and a capacity to perform cesarian sections. If Anderson's condition indicated she might need those services, failure to remove her from Fort Yates to Bismarck would constitute negligent medical care.

Fetal-heart tape monitors can also be used to detect in utero distress. A fetal monitor strip was run on Marie Anderson on September 11, the day before she gave birth to Casey. A second fetal monitor strip was run by nurse Tony Mann when Marie Anderson arrived at the Fort Yates facility on September 12. This strip was run for forty minutes and discontinued at 1:30 a.m., over five hours before Marie Anderson began active labor. There is dispute as to whether a third fetal monitoring strip was run. The United States claims that a strip without the name of the patient or the date taken was actually one run on Marie Anderson at 11:00 a.m. The plaintiffs dispute this, noting that in her deposition, Nurse Meyer had said that a strip was run on another woman that same morning. The "no name" strip was a non-stress test, a type that is applied to the exterior of the woman's abdomen. Dr. Stephen Cruikshank, an expert in the field of obstetrics, noted that because the monitor was applied externally, it is of little value in determining when contractions occurred. Because of this, this Court finds that it is unnecessary to determine whether the strip was actually Marie Anderson's. The strip as taken was inadequate to give an accurate assessment of the condition of the fetus.

From the evidence given at trial, this Court concludes that the Fort Yates Hospital was negligent in not paying more attention to the blood pressures of Marie Anderson registered by its staff. While its policy of providing level one care to isolated communities is worthwhile, it can only work if proper attention is given to detecting signs of potential high risk. Since the nearest level three center is over an hour's distance from Fort Yates, such indications should be detected as early as possible for transport to be arranged. The evaluation of fetal well being through fetal monitoring was totally inadequate in this case. No notice was taken of Marie Anderson's dangerously high blood pressure levels. The Fort Yates Hospital was negligent in not providing more careful monitoring of the situation.

II. *Whether Marie Anderson's untreated alleged condition of PIH, preeclampsia, or both, caused Casey Anderson to suffer intrapartum asphyxia.*

 Dr. Prensky, an expert on the area of birth asphyxia and hypoxia, testified for the United States. Prensky noted that although symptoms may vary from case to case, cases of hypoxia, or oxygen deprivation, usually have a similar "constellation of immediate signs just after birth." According to Prensky, the course of a new born hypoxic infant includes:

1) The child is born not breathing.

2) The child requires resuscitation.

3) Weak cry (usually).

4) Weak suck.

5) Usually very hypotonic.

6) Cyanotic (blue color).

7) Seizures in the first several days of life.

8) Usually lethargic and comatose.

While this list does not represent a complete list of considerations in a case of alleged birth asphyxia with resulting hypoxia, it represents a good place to begin analysis.

There is little controversy that at birth, Casey Anderson was unable to breathe under his own efforts. Dr. Montz, as a consultant to the Fort Yates Hospital, hap-

pened to be in the delivery room at the moment Casey was born and resuscitated the infant. He did so by a process known as "bag-breathing," a relatively moderate form of resuscitation. Children born after intrapartum asphyxia require at least bag breathing to start their own respiratory effort.

At birth, Casey's cry was described by several observers as "strange." Asked what this meant, one observer, Dr. Mary Louise Soentgen, the physician who arrived with the helicopter, said Casey's cry had an odd pitch, and that it was rather softer than a normal child's. That Casey had a weak suck is not contested. Several observers noted the weak suck, and it prevented his nursing from his mother, Marie Anderson.

A more contested issue is that of hypotonicity, or lack of tone. The great majority of children born after birth asphyxia are born hypotonic. Casey Anderson was born hypertonic. Dr. Prensky noted that some children who suffer birth asphyxia are born hypertonic, but that such hypertonicity usually takes the form of extension rigidity, where the baby is almost stiff in his extension. Casey fits within this exception.

Another sign of a hypoxic infant is cyanosis, or blue color. Casey was born cyanotic. Seizures in the first few days of life were another indication of an hypoxic infant noted by Dr. Prensky. The experts for Anderson also agreed that seizures are a sign of hypoxia. Dr. Graven, another defense expert, disagreed with Prensky and stated that a child born hypoxic cannot have seizures for the first several days of life because the hypoxic injury so disables the brain. This Court believes this apparent controversy between the experts is resolved after a careful review of the evidence. A newborn infant's nervous system is not as fully functioning as that of a child just a few days older. It is thus true that a newborn cannot have grand mal seizures. Drs. Prensky and Soentgen, both neonatologists trained in treating newborns, noted that such infants experience what is termed a "subtle" seizure. A subtle seizure is such that it might not even be apparent to those not trained in newborn care. A subtle seizure can be indicated by the infant drawing his arms up to his chest, by rapid eye movement from side to side, or a stiffening of the body. Casey Anderson suffered such symptoms. This Court finds that Casey Anderson suffered repetitive subtle seizures through his first six days of life. On his sixth day of life, Casey had his first grand mal seizure. These seizures have continued up until the present day, and are kept under control with the use of phenobarbital.

Casey was not comatose when born. He was, however, lethargic at birth. Dr. Soentgen noted this condition when she arrived to transport Casey to Bismarck approximately an hour and twenty minutes after his birth. Dr. Soentgen continued to observe and treat Casey for the first week of his life. As a neonatologist, her observation that Casey continued to be lethargic is significant. This Court finds that Casey was lethargic during the course of his newborn cycle.

By and large, Casey fits the eight criteria laid out by Dr. Prensky for children born with birth hypoxia. This alone would allow a finding of causation. Other evidence in the case, however, also supports the conclusion that the negligence of the Fort Yates Hospital caused Casey Anderson's serious and permanent injuries. Such evidence, especially that presented by Casey Anderson's treating physicians, makes a ruling of causation the clear choice.

When Casey arrived at the MedCenter One Hospital in Bismarck, Dr. Soentgen ran a battery of tests upon him to see if there was another cause for the problems he had than that of birth asphyxia. A TORCH test was run on Casey. The results of the TORCH test were negative. This negative finding ruled out an infection caused by such things as rubella or toxic exposure (such as fetal alcohol syndrome) as the cause of Casey's injuries. Amino acid screening tests run by Dr. Soentgen were also negative, ruling out an inborn metabolic error as the cause for Casey's

injuries. Two separate chromosome tests were later performed, one at the University of Minnesota, the other at the University of North Dakota. Both tests could find no chromosomal disorder responsible for Casey's condition. This means that there is no congenital basis for Casey's brain injury and severely delayed development based on both clinical evidence and diagnostic testing.

Dr. Gerald Slater, a pediatric neurologist with an active clinical practice, also treated Casey. Dr. Slater is experienced in the diagnosis of etiology (causation) of mental retardation in depressed newborns. It is Dr. Slater's opinion, based on reasonable medical certainty, that Casey's brain injury and mental retardation is due to intrapartum birth asphyxia. In reaching this conclusion, Dr. Slater ruled out all other known causes. Dr. Slater based his opinion on his examinations of Casey, the birth record of the hospital, and on the Pregnancy Induced Hypertension and preeclamptic condition of the mother, Marie Anderson.

Dr. Slater also provided insight to some of the medical records relating to Casey. During a hypoxic incident, the body acts to protect the brain from damage. Oxygen supplies to other organs will be curtailed so that the brain can receive oxygen so long as possible. When Dr. Soentgen took Casey to MedCenter One, she ordered a CPK test run on him. A CPK exam measures the level of an enzyme produced by the muscles or brain. This enzyme is produced when inadequate oxygen is reaching those areas. A CPK test is run if the doctor suspects hypoxia. The normal infant test results in a CPK rate of 10 to 200. Casey's test measured a CPK rate of over 2,000. Dr. Slater explained that without an accompanying diagnosis of heart disease, such a rate can be explained only by a diagnosis of intrapartum hypoxia.

That Casey suffered a hypoxic incident is also indicated by his condition of cardiomegaly, also known as an enlarged heart. Cardiomegaly results when the heart is pushed to circulate blood to the brain during a hypoxic episode. Casey's kidneys also support the diagnosis that intrapartum

asphyxia was the cause of his injuries. Casey did not urinate until he was 21 hours old. This indicates that his other organs "shut down" during his hypoxic episode so that oxygenated blood could continue through to his brain.

The United States contends that Casey Anderson suffers from congenital injuries suffered during the first trimester of Marie Anderson's pregnancy. This assertion is not supported by the evidence. Casey was not born microcephalic (with a small head) but became microcephalic only after birth. Dr. John Martsolf, a pediatrician and a board certified geneticist, examined Casey and charted his head circumference growth rate for the first two years of life. He noted that Casey was not born with primary microcephaly (small head at birth).

Primary microcephaly would indicate that Casey suffered a congenital problem. Instead, Casey had secondary microcephaly, which means that Casey's head was of a normal size at birth, but that it ceased to grow at a normal rate from that point onward. The growth of an infant's head is spurred by the growth of his brain. A child whose head is normal in size at birth, but that later ceases to grow indicates an injury at the time of birth. Dr. Martsolf testified that Casey had microcephaly following his birth caused solely by asphyxia during the labor and delivery period. Dr. Martsolf also testified that Casey's brain injury and mental retardation were the result of the intrapartum birth asphyxia.

The passage of meconium, noted when Marie Anderson's membranes were ruptured at 10:55 a.m., is a further indicator that there was distress in utero. Uteroplacental insufficiency compromises the fetus's oxygen supply during labor. As stated above, the body of a fetus in distress will relinquish control of essential organs in order to protect his brain. Meconium staining results when the fetus's intestines shut down, resulting in a bowel movement. If the distress is sufficient, the fetus will gasp in utero and ingest meconium. Casey ingested meconium.

Large segments of evidence at the trial disputed the accuracy of certain APGAR

scores given Casey by Nurse Meyer at birth. APGAR scores are used to assess certain conditions of the newborn infant and are taken at one and five minutes of life. APGAR scores can be helpful in assessing the possibility of intra partum asphyxia, but, as noted by Dr. Montz, are not in and of themselves conclusive. It is this Court's determination that the APGAR scores were neither fraudulently changed by the Fort Yates Hospital personnel, nor is their accuracy such that this Court considers them dispositive. While numbers were crossed over and replaced with others in the APGAR scores columns in the birth record, the totals at the bottom of the lists remained the same. This Court finds that while the taker of APGAR scores may have been uncertain, she had no intent to fraudulently change the scores with an eye to this litigation. This Court also heard evidence, however, that the correct procedure in taking APGAR scores ensures that a disinterested party score the newborn infant's progress. Nurse Meyer, the person who delivered Casey, also took his APGAR scores. While the scarcity of personnel at Fort Yates competent to take APGAR scores may have partially explained this decision, it renders the scores unreliable.

It is the assertion of the plaintiffs that Casey's brain damage and cerebral palsy was caused by intrapartum asphyxia—a placental disruption causing a loss of oxygen via the blood supply to the child. There was evidence given at trial that intrapartum asphyxia could have been diagnosed by a fetal heart-rate monitor continually applied or through the physical manifestations of Marie Anderson. This Court finds that the negligent failure of the Fort Yates Hospital to provide such diagnosis caused Casey Anderson's injuries. This Court also finds the United States liable to Casey Anderson for all damages suffered due to his injury.

### III. *Damages.*

A child born after suffering intrapartum asphyxia may suffer devastating injuries. Since these are often children who would otherwise be born normal, damage awards in these cases can be enormous. *See e.g.,*

*Scott v. United States,* 884 F.2d 1280 (9th Cir.1989) (upheld over $6 million of an $8.7 million verdict against United States in a similar case of birth asphyxia); *Nelson v. Trinity Medical Center,* 419 N.W.2d 886 (N.D.1988) (upheld $5.6 million verdict for brain damage suffered by infant during unmonitored fetal distress). Damage awards for Casey Anderson must include at least the cost of his life long care.

Damages in North Dakota are covered by statute. *See Jacobs v. Anderson Bldg. Co.,* 430 N.W.2d 558, 559 (N.D.1988) (citing N.D.C.C. 32–03.2–04). N.D.C.C. 32–03.2–04 applies expressly only to claims accruing after July 8, 1987. The North Dakota Supreme Court, however, has used this indication of legislative intent to alter its own policy of dealing with loss of consortium for cases commencing before this date. *See id.* at 559–60. N.D.C.C. 32–03.2–04 states,

*Economic and noneconomic damages for wrongful death of injury to person.* In any civil action for wrongful death of injury to a person and whether arising out of breach of contract or tort, damages may be awarded by the trier of fact as follows:

1. Compensation for economic damages, which are damages arising from medical expenses and medical care, rehabilitation services, custodial care, loss of earnings and earning capacity, loss of income or support, burial costs, cost of substitute domestic services, loss of employment or business or employment opportunities and other monetary losses.

2. Compensation for noneconomic damages, which are damages arising from pain, suffering, inconvenience, physical impairment, disfigurement, mental anguish, emotional distress, fear of injury, loss or illness, loss of society and companionship, loss of consortium, injury to reputation, humiliation and other non-pecuniary damage.

*Id.* at 559–60. This Court is bound by North Dakota law and will consequently award damages pursuant to N.D.C.C. 32–03.2–04. Also in accordance with North Dakota law, this Court will present a sepa-

rate finding on damages. *See* N.D.C.C. 32–03.2–05 (when awarding compensation for damages, the trier of fact shall specify the amount for past economic damages, future economic damages, and non-economic damages).

A. Economic Award

█ Intrapartum asphyxia has left Casey Anderson severely disabled. Casey is presently a five-year old who will never walk, talk, see, or earn a living. Casey is unable to control his bowel movements, and must be fed through a jejunostomy tube in his abdomen at two hour intervals. Dr. Alan Kelts, Casey's current pediatric neurologist, listed Casey's abilities to respond to his environment when he most recently observed Casey. Dr. Kelts stated that Casey does feel pain, will laugh when tickled, and can hear. Casey will also continue to need regular treatment by a neurologist to keep his seizure activity in check.

Dr. Steven Kovarik, Casey's treating pediatrician, puts Casey's life expectancy in the 40 to 50 year range. Casey requires 24–hour supervision, highly skilled care to provide jejunostomy feedings, and daily medications. Since Casey is unable to walk, crawl, or even roll on his own, he also requires great amounts of physical effort to move him around in the course of a day.

From his birth to the present, Casey has lived with and been supported by his grandmother, Claudette Schott. Mrs. Schott's care and love have been one of the few bright spots in Casey's life to date. Despite the excellent care provided by Mrs. Schott thus far, it is this Court's belief that she will be less able to handle this strain as Casey continues to grow in size. Out of home placement seems probable in the near future.

1. *Future Economic Damages*

To deal with the economic costs of care and upkeep, this Court awards Casey Anderson $2.4 million. This sum will provide for Casey's future medical and living costs based on evidence given at trial. Such figures have been calculated by adjusting the current costs of such services and the present value of such medical needs in light of the evidence presented at trial by Dr. Feldman, an economist specializing in medical costs.

Since Casey would have been born normal except for the negligent medical attention he received from defendant, he also claims lost earning capacity against the United States. Casey's natural mother and her two siblings had all received their high school diplomas. Casey's putative father holds a college degree. There is a strong likelihood that Casey would also have received a high school diploma. This Court has figured lost earning capacity with the assumption that Casey would finish high school and awards him $760,000 for lost earning capacity. This amount is expressed in the present value of earning capacity.

2. *Past Economic Damages*

Casey's medical bills to date have totalled approximately $160,000. This Court orders that these expenses must be repaid by the United States. Mrs. Schott has also expended great amounts of time and resources feeding and caring for Casey. This Court believes these actions go towards proving an in loco parentis claim of Mrs. Schott for loss of consortium with Casey. (*See* Below). Since these actions were voluntary, however, an award for quantum meruit would be inappropriate.

B. Loss of Consortium

█ Traditionally, North Dakota did not allow recovery for the loss of society, comfort, and companionship of a child. As other states in the region began to grant such awards, however, the North Dakota Supreme Court began to rethink its position on the issue. *See Hopkins v. McBane*, 427 N.W.2d 85, 90–92 (N.D.1988). In *Hopkins*, the North Dakota Supreme Court decided to allow loss of consortium awards in addition to the traditional mental anguish damages granted in personal injury cases. *Id.* at 92. The death or injury of a minor child,

> is a deep emotional wounding, and it may be admitted that there is a decided tendency for the law to compensate for the grievous injury to family feelings involved … or … to place a money value

upon that lost companionship, deprived presence, and the co-adventuring implicit in the parent child relationship.... The sentimental aspects of family life may be materialized without being vulgarized.

*See id.* at 91–92 (citing S. Speiser, *Recovery for Wrongful Death 2d,* § 3:49, p. 321 (1975)).

Mrs. Schott has cared for Casey Anderson since his birth. She loves Casey, and considers herself to be his mother. Mrs. Schott and her husband, who also shares the job of caring for Casey, have begun proceedings to adopt Casey. Mrs. Schott is a registered member of the Sioux tribe. In the American Indian [2] culture, family relations can take on a special significance not always apparent to the dominant white culture. *See Hopkins v. McBane,* 427 N.W.2d 85, 95 (N.D.1988) (held that the special values of American Indian culture supported a damage award for death of unborn child). Mrs. Schott has been deprived the love and companionship of her grandson, a loss especially painful to one of American Indian heritage. As such she has shown a loss significant enough to justify a claim for loss of consortium.

Mrs. Schott's claim is also supported using an in loco parentis analysis. A person stands in loco parentis when he or she stands in the shoes of a lawful parent by assuming the obligations of parental relations without going through all of the formalities of legal adoption. 59 Am.Jur.2d *Parent and Child* § 88 (1971). Grandparents do not automatically qualify for in loco parentis status. *Id.* § 92. Even if the natural parent of the child is alive, a grandparent may stand in loco parentis. *Id.* The grandparent must have more than mere custody of the child; financial support is also necessary. *Id.* §§ 88, 92.

Mrs. Schott has had custody and the burden of supporting Casey since his birth. Her actions and her care mean that she stands in loco parentis to him. As such, she has substantially the same rights and liabilities as those between a parent and child. *Id.* § 88. Mrs. Schott has borne the financial burden for Casey Anderson, has dealt with the strain of waking every two hours to feed him, and the worries of motherhood. Marie Anderson has given birth to two other children since Casey; both of these children live with their paternal grandparents. It is thus extremely likely that Mrs. Schott would have been thrust into the role of motherhood for Casey regardless of his condition at birth. As such, Mrs. Schott can recover damages for loss of consortium under N.D.C.C. 32–03.2–04. The United States is accordingly directed to pay Mrs. Schott $525,000 to compensate her for past and future loss of consortium with her grandson.

Marie Anderson has also claimed damages based upon loss of consortium and emotional strain. Marie Anderson left Casey with her mother because she was unable to deal with the stress of rearing a severely retarded child. Marie Anderson was nineteen years old when she left Casey, but her continued attitude has shown little regard for his growth and development. As such, she has forfeited any claim based upon loss of consortium or undue strain.

IV. *Whether the damage award should be offset by amounts not allowable under the Federal Tort Claims Act.*

The Federal Tort Claims Act (FTCA) is a waiver of immunity from suit that the United States enjoys under the doctrine of sovereign immunity. *See Flannery for Flannery v. United States,* 718 F.2d 108, 110 (4th Cir.1983). Under the FTCA, the United States is to be held liable for its negligent actions "to the same extent as a private individual under like circumstances." *Id.* (citing 28 U.S.C. § 2674 (1965)). This waiver, however, extends only to compensatory damages. *Id.* Punitive damages may not be recovered from the United States. *Id.*

---

**2.** This Court uses the term "American Indian" rather than "Native American" simply because of the confusion the latter can cause. For instance, when this Court asked one of the witnesses whether her husband was a Native American, the witness replied, "Oh yes, both of his parents came here from Germany." When then asked whether her husband was an American Indian, the witness said "No, he's 100% German."

■ North Dakota applies the collateral-source rule broadly to bar evidence concerning potential government benefits a plaintiff might receive when formulating a damage award. *Nelson v. Trinity Medical Center,* 419 N.W.2d 886, 892–93 (N.D. 1988). The collateral-source rule is designed to prevent a tortfeasor from taking advantage of payments made to an injured party by a source independent other than the tortfeasor. *Id.* North Dakota believes that a negligent defendant,

> is responsible for the damages, and he cannot take advantage of the fact that someone may have repaired the truck without charge, or that some friends may have contributed to the cost, or that some dealer may have been generous enough to give plaintiff a brand new truck in place of the old one.

*Id.* at 893 (citing *Keller v. Gama,* 378 N.W.2d 867, 868 (N.D.1985)).

Policy considerations lay at the heart of such a rule. Once negligence and causation is found, the tortfeasor takes on the additional role of a wrongdoer. The collateral-source rule ensures that a

> wrongdoer should not benefit at the expense of an innocent party, even where the injured party subsequently receives reimbursement from someone other than the wrongdoer. If an injury has occurred it is subject to specific remuneration.

*Id.* at 893 (citing *Keller,* 378 N.W.2d at 868). Under North Dakota law, a tortfeasor may never profit when an injured party receives assistance from an independent source. *Id.* An independent source includes government programs designed to benefit the mentally retarded.

■ The United States maintains that applying the collateral-source rule in the present case would expose it to punitive damages of the sort not recoverable under the FTCA. Punitive damages, the United States claims, are those that award more than the actual loss suffered by the plaintiff, awards that do more than compensate or reimburse. *Flannery for Flannery v. United States,* 718 F.2d 108, 111 (4th Cir. 1983). The United States believes that allowing plaintiffs in the present case to recover damages for services also provided by federal, state, or local government would amount to a damage award that does more than compensate or reimburse. As such, the United States believes that such a claim would be punitive and thus barred by the FTCA.

Plaintiffs disagree with the United States' approach to the issue of whether government funds constitute punitive damages. They note that the Ninth Circuit has flatly rejected the approach in *Flannery,* and has used the collateral source rule in allowing damage awards to exclude all evidence of government benefits. *See Siverson v. United States,* 710 F.2d 557, 559–60 (9th Cir.1983). North Dakota also uses the collateral source rule to make evidence of future government benefits inadmissible when awarding damages to an injured plaintiff. *See Nelson v. Trinity Medical Center,* 419 N.W.2d 886, 892–93 (N.D. 1988). Plaintiffs contend that no subtraction from the total damages awarded may be made for federal, state, or local benefits provided to the mentally retarded or developmentally disabled.

The Eighth Circuit, whose rulings control this Court, has not yet ruled on whether the collateral-source rule may be applied to all government benefits when determining FTCA claims. This Court is aware that in tort litigation, enormous damages awards are often given which bear little relation to true economic loss. This Court agrees that a conservative approach to awarding damages in FTCA actions is the proper one. Indeed, when calculating damages in the present case this Court tried to keep damages as low as possible, subtracting taxes and such from various awards. In a case where a plaintiff has suffered devastating injuries caused by defendant's negligence, however, any damage award is bound to be enormous. Casey Anderson will require 24–hour per day care for the rest of his life, which is estimated to last another forty to fifty years. The United States must understand that the large size of a damage award is not caused by a desire by this Court to punish its actions, but because of

the nature of the injury it caused Casey to suffer.

This Court declines to follow the rulings of either the Ninth or the Fourth Circuits. Instead, this Court believes the proper solution is found in *Overton v. United States,* 619 F.2d 1299 (8th Cir.1980). In *Overton,* a lady who had been vaccinated for the swine flu became ill as a result of the vaccination. She sued the United States, who had given her the shot. Since this claim arose under the FTCA, a problem of benefits and the collateral source rule came up. The Eighth Circuit held that Medicare payments could be set off against damages owed the plaintiff since this would not allow plaintiff to enjoy a "double recovery" from the federal coffers.[3] *Id.* at 1307–09.

The *Overton* holding fits in well with the present case. The collateral source rule is designed to prevent a tortfeasor from benefiting from *collateral* aid a plaintiff may receive. Here, the United States is the tortfeasor. Sources of aid also provided by the United States for the disabled are thus not collateral but primary in nature, and may be offset from the award for $2.4 million for future medical and housing care and from the $160,000 awarded for past medical costs.

The United States has also claimed that it should be able to offset amounts provided Casey by South Dakota█ and local funds since these are provided pursuant to the Education of All Handicapped Children Act (EAHCA). The United States has provided no data as to what percentage of South Dakota benefits are funded by the federal government. The collateral source rule protects the taxpayers of South Dakota from picking up the costs of the United States' negligence. While it cannot offset state and local expenditures, the United States is still protected from making double payments to Casey. *See Overton,* 619

F.2d 1299, 1307–09 (8th Cir.1980). If a portion of the funding for South Dakota benefits comes from the federal government the United States should be allowed to offset this amount from Casey's damage award. For example, if South Dakota provides a benefit worth one dollar, the United States cannot offset this dollar from the amount owed Casey. If, however, the United States can prove that thirty cents of that dollar is provided by federal money, it can offset Casey's damages by thirty cents.

█ The United States also claims that the $760,000 lost earning capacity award for Casey and the $525,000 loss of consortium damages for Mrs. Schott amount to punitive damages. Under North Dakota law, this is not the case. Loss of consortium and lost earning capacity awards are not considered punitive in North Dakota. *See McKee v. Thompson,* 558 F.Supp. 68, 69–70 (D.N.D.1983). The North Dakota legislature has determined that noneconomic loss is recoverable, but this does not mean that this type of recovery is punitive. *See Hopkins v. McBane,* 427 N.W.2d 85, 87 (N.D.1988). In *Hopkins* the North Dakota Supreme Court, in an insightful manner, traces the history of loss of consortium claims. *Id. Hopkins* notes that changing mores now recognize those losses commonly grouped under the loss of consortium umbrella, namely loss of society, association, companionship, and comfort and affection. *Id.* at 90. Recovery for such losses, while noneconomic, is not punitive.

## CONCLUSION

Casey Anderson has suffered severe injuries at the hands of the United States and its agents. The costs for providing for his future care will be enormous, but the United States may be able to reduce these amounts through a showing of the source of funds provided to Casey for his medical

---

**3.** The *Overton* case also discussed a complex theory of the source of benefits. This source theory is used by Missouri in applying the collateral source rule. Since North Dakota does not draw such a distinction, this part of the *Overton* ruling does not apply to the case at hand. *See id.* at 1307–09.

and other expenses. The United States shall have an opportunity to do this.

Therefore it is ordered:

1) That the United States shall pay Claudette Schott $525,000 to compensate her for loss of Consortium Damages.

2) That the United States shall pay $760,000 in Lost Earning Capacity, $160,000 in Past Medical Expenses, and $2.4 million in Future Medical and Economic Expenses into a trust account for Casey Anderson. Claudette Schott shall be a Trustee for Casey Anderson so long as she may be able and willing to so serve.

3) That Counsel for the Plaintiff shall, without additional fee, assist the Plaintiff by designing and preparing a Trust Instrument which provides for three trustees— one of which shall be a financial institution handling Federally Insured Deposits. The trust, as constructed and executed, shall be filed with and administered under the direction of that state court of South Dakota which administers trusts for minor beneficiaries.

4) That the United States may, if it so chooses, make an accounting to this court showing those expenses it wishes to offset in regard to the $160,000 in Past Medical Expenses and the $2.4 million in Future Expenses. Those sums the United States shows should be offset will be returned when such showing has been completed.

Let Judgment be entered accordingly.